******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

Clark, Seeley and DiPentima, Js.

*Syllabus*

The plaintiffs, F and V, sought to recover damages from the defendants for
the alleged wrongful termination of their employment in violation of
the statute (§ 31-290a) prohibiting discrimination against employees
exercising their rights under the Workers' Compensation Act (§ 31-275
et seq.). The plaintiffs were two of five special police officers who
worked for the defendant Board of Education of the City of Bridgeport
(board), and their work included patrolling the neighborhoods around
the schools. In 2012, the Bridgeport Police Department assumed author-
ity over security for the public schools in Bridgeport, and the plaintiffs
began reporting to G, a supervising officer with the Bridgeport Police
Department. The plaintiffs then began performing duties outside of the
school area, including handling regular police calls. In February, 2014,
F sustained an injury to his back during the course of his employment
for which he sought and received workers' compensation benefits. When
F informed G of his need for back surgery, G made certain disparaging
comments toward him. In November, 2015, V sustained a work-related
injury to his wrist for which he sought and received workers' compensa-
tion benefits. When he returned to work, he spoke with G about having
surgery, but G turned the conversation to the topic of F's back surgery
and again made certain disparaging comments. At a regular meeting of
the board in June, 2016, the board voted to pass a motion to eliminate
the five special police officer positions, along with 125 other positions,
from the board's 2016-2017 budget, because the Bridgeport School Dis-
trict was facing a financial crisis. The plaintiffs were laid off from their
positions effective August 12, 2016. Following the elimination of the
special police officer positions by the board in 2016, the plaintiffs' union
filed a grievance against the defendant city of Bridgeport (city) and the
board, alleging a violation of a no layoff provision in a memorandum
of understanding between the parties. The matter went to arbitration
before an arbitration panel, which determined, in July, 2018, that the
memorandum of understanding had been violated, and ordered the rein-
statement of the five special police officers. Subsequently, the plaintiffs
were notified that when they returned to work, they would receive layoff
notices, as funding had never been restored for the special police officer
positions and the memorandum of understanding had expired in June,
2018, and was no longer applicable. The plaintiffs then commenced this
action, and the trial court granted motions for summary judgment filed
by the city and the board, and the plaintiffs appealed to this court. *Held*:
1. This court declined to review the plaintiffs' claim that the trial court
improperly focused or limited its analysis of their discrimination claim
to the 2016 layoffs because their claim encompassed the events related
to the 2018 reinstatement order and the defendants' 2018 postarbitration
conduct, as that claim was not properly before this court: in their appel-
late briefs, the plaintiffs did not provide any argument or analysis or
cite to anything in the trial court record that would demonstrate why
the court was wrong in determining that the discrimination claim before
it pertained only to the 2016 decision of the board to eliminate the
special police officer positions, the plaintiffs never filed a motion for
reconsideration or articulation of the court's decision on this issue, and it
was not the responsibility of this court to search the record to determine
whether the trial court's determination found support in the record;
moreover, the trial court expressly stated in its decision that any claim
concerning the 2018 reinstatement order was not before it and never
addressed or decided any such claim, and it would be fundamentally
unfair to the defendants for this court to review a claim that was neither
addressed nor decided by the trial court; furthermore, the defendants
objected to this court's consideration of the plaintiffs' discrimination
claim as it related to the events in 2018, and the plaintiffs did not assert

the existence of any exceptional circumstances to warrant this court's review of a claim not decided by the trial court and failed to raise any claim in their brief challenging the trial court's determination that the sole issue before it concerned the board's 2016 decision.

2. The trial court properly granted the defendants' motions for summary judgment because no genuine issues of material fact existed as to whether the plaintiffs established a prima facie case that their positions were eliminated and they were laid off in 2016 in violation of § 31-290a for exercising their rights to workers' compensation benefits and whether the alleged nondiscriminatory reason given by the defendants for the plaintiffs' layoffs was pretextual:

a. Although the plaintiffs claimed that genuine issues of material fact existed as to whether they met their burden of establishing a prima facie case of employment discrimination under § 31-290a, this court did not need to reach the merits of that claim, and, as was done by the trial court, this court assumed, without deciding, that the plaintiffs both met their initial burden of establishing a prima facie case.

b. On the basis of this court's plenary review of the evidence submitted in support of and in opposition to the motions for summary judgment, this court agreed with the trial court's conclusions that the defendants successfully rebutted the presumption of discrimination and that the plaintiffs failed in their burden of producing evidence to show the existence of a genuine issue of material fact that the nondiscriminatory reason offered by the defendants was not worthy of credence or was pretextual: the documentary evidence submitted by the defendants in support of their motions for summary judgment provided substantial, uncontroverted support for the defendants' asserted nondiscriminatory reason for eliminating the special police officer positions and laying off the plaintiffs in 2016, namely, that the funding for the special police officer positions was eliminated due to financial considerations; moreover, the plaintiffs did not meet their burden of demonstrating a genuine issue of material fact that the legitimate, nondiscriminatory reason offered by the defendants was not worthy of credence or was pretextual, as they provided no evidence contradicting, inter alia, the affidavits submitted by the defendants from five of the board members who participated in the vote to eliminate the positions that confirmed that the plaintiffs' workers' compensation claims were not a factor in their decision, no evidence showing any connection whatsoever between the board's decision to defund and eliminate the special police officer positions and the plaintiffs' filing of claims for workers' compensation benefits, and no evidence providing evidentiary support for their assertion that the board's decision was retaliatory in nature and connected with their protected status under § 31-290a; furthermore, the plaintiffs' assertions were conclusory and speculative, and were not sufficient to create a genuine issue of material fact to defeat summary judgment, especially when it was undisputed that the defendants treated all of the special police officers the same.

Argued October 11, 2023—officially released January 16, 2024

*Procedural History*

Action to recover damages for the alleged wrongful termination of the plaintiffs' employment, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the action was withdrawn as to the defendant Police Department of the City of Bridgeport; thereafter, the court, *Stevens, J.*, granted the motions for summary judgment filed by the named defendant et al. and rendered judgment thereon, from which the plaintiffs appealed to this court. *Affirmed.*

*John T. Bochanis*, for the appellants (plaintiffs).

*John P. Bohannon, Jr.*, deputy city attorney, for the appellants (named defendant et al.).

*Richard J. Buturla*, with whom was *Warren L. Holcomb*, for the appellant (defendant Board of Education

of the City of Bridgeport).

*Opinion*

SEELEY, J. This appeal arises out of an action by the plaintiffs, Jonathan Forestier and Stephen Vitka,[1] against the defendant city of Bridgeport (city) and the defendant Board of Education of the City of Bridgeport (board)[2] alleging that the plaintiffs wrongfully had been laid off from their employment as special police officers with the board for having exercised their rights to workers' compensation benefits, in violation of General Statutes (Rev. to 2015) § 31-290a (a).[3] The trial court granted motions for summary judgment filed by the defendants and rendered judgment in their favor, from which the plaintiffs have appealed. On appeal, the plaintiffs claim that the court improperly granted the defendants' motions for summary judgment because genuine issues of material fact exist as to whether (1) the plaintiffs established a prima facie case of discrimination, and (2) the defendants' proffered nondiscriminatory reason for the elimination of the plaintiffs' positions and their layoffs was a pretext for discrimination. We affirm the judgment of the court.

The following facts, viewed in the light most favorable to the plaintiffs as the nonmoving parties, or as otherwise undisputed in the record, and procedural history are relevant to our resolution of this appeal. Vitka, a graduate of the Bridgeport Police Academy, commenced working as a special police officer assigned to the board in 1997. Similarly, Forestier, a graduate of the Hartford Police Academy, commenced working as a special police officer assigned to the board in 2011. As special police officers for the board, the plaintiffs' employment was governed by a collective bargaining agreement between the city and the National Association of Government Employees, R1-200 (NAGE).[4] The board was not a party to the contract between NAGE and the city. By 2016, five individuals in total worked as special police officers for the board.

The plaintiffs' work as special police officers included patrolling the neighborhoods around the schools; the plaintiffs were not assigned to any specific school building. In 2012, however, the Bridgeport Police Department assumed authority over security for the public schools in Bridgeport, and, as a result, the plaintiffs began reporting directly to Police Lieutenant Paul Grech, a supervising officer with the Bridgeport Police Department.[5] The special police officers also started performing duties outside of the school area, including handling regular police calls, performing radar enforcement and motor vehicle stops, and providing backup assistance to regular police officers.

In February, 2014, Forestier sustained an injury to his back during the course of his employment for which he sought and received workers' compensation benefits. As a result of the injury, he was restricted to light

duty and did not miss any time from work. Following an MRI, however, his doctor recommended that he undergo back surgery. After Forestier informed Grech of his need for back surgery, Grech told Forestier that he "would be dumb to get . . . back surgery" and that, if he underwent the surgery, his career would end and no police department would ever hire him. Forestier held off getting the surgery until September, 2016, out of fear of losing his job. In his affidavit, Forestier attested that he had been approved by the Workers' Compensation Commissioner to wear a tactical vest "to minimize [his] pain so that immediate surgery would not be necessary. . . . Grech also opposed the vest . . . [and] made it known to [Forestier that he] didn't need the vest in [Grech's] opinion." Forestier wore the vest, despite the fact that it was clear to him that Grech was unhappy and that Forestier "would pay for this later."

In November, 2015, Vitka sustained a work-related injury to his wrist for which he sought and received workers' compensation benefits. As a result of his injury, Vitka missed five to six months of work, and he returned to full duty in May, 2016. In his deposition testimony, Vitka testified that, when he returned to work following his injury, he spoke with Grech about having surgery on his wrist, but that Grech turned the conversation to the topic of Forestier's back surgery and made statements about how Forestier was going to lose his job and that he was not going to be hired anywhere else. Grech also talked about another special police officer, Jeffrey Babey, who also had sustained a compensable work-related injury, and how Babey was going to lose his job. Vitka testified at his deposition that, although Grech never told him not to have the surgery, he felt that Grech's numerous comments about Forestier and Babey insinuated that Vitka should forgo having the wrist surgery. Despite the fact that his treating physician recommended that he have surgery on his wrist, Vitka never had the surgery.

A regular meeting of the board was held on June 27, 2016, at which the members of the board voted to pass a motion to eliminate the five special police officer positions from the board's 2016–2017 budget. At the time of that vote, the Bridgeport School District (school district) faced a financial crisis[6] due to the fact that the operating budget for the school district for the fiscal year 2016–2017 increased by only $59,550. Given the rising costs associated with general wage and salary increases as required by collective bargaining agreements, health insurance, and special education, there was an initial budget deficit of almost $16 million, which was subsequently reduced to a $15 million deficit after an additional appropriation to the board of $905,000 was made. See footnote 6 of this opinion. In an effort to close that gap without reducing the number of classroom teachers, the school district eliminated 130 posi-

tions from the 2016–2017 fiscal year budget, either by attrition, movement to different positions or layoffs. The eliminated positions included, inter alia, forty-seven kindergarten paraprofessionals, twenty-six home school coordinators, thirty university interns, nine clerical employees for the school district's office, five elementary school guidance counselors, the five special police officers, one custodian and one maintenance person.

At the outset of the June 27, 2016 board meeting, concerns were expressed regarding budget cuts and the financial issues facing the school district. Board member Howard Gardner, speaking on behalf of the finance committee of the board, made several recommendations, including moving to eliminate the special police officer positions from the 2016–2017 budget. His motion was seconded by board member Maria Pereira, and Gardner commented that "the concern is not the officers themselves, but the way they are being managed by the city." Pereira stated: "[T]he [special police officers] for the most part are wonderful, but the reality is we started with a $16 million deficit because the mayor didn't give one extra dollar for schools initially . . . . Now, the city has contributed an additional $900,000, leaving the board with a $15 million deficit. . . . [T]he board had ten [special police officers] in its budget in 2013. Five [of them] who retired weren't replaced and the dollars were shifted to security guards. . . . [T]he [special police officers] have been used for nonschool work, including domestic violence calls and traffic enforcement, even though the board pays the full salary of [those officers]. . . . [T]he five [special police officers] make $49[2],000 a year, not including overtime, and that amount was being directed back into schools and positions that work directly with children." Thereafter, Pereira moved that the board keep the five special police officers under the conditions that their salaries be funded by the city and the city stops directing them to perform work unrelated to the schools. Pereira, however, withdrew her motion after a board member suggested that it was overly complicated. The original motion to eliminate the positions was approved by a vote of six to two. Thereafter, the five special police officers were laid off from their positions effective August 12, 2016.

After the layoffs, Vitka was able to exercise bumping rights under his union contract and was offered a position as a school security guard. Because the salary for that position was substantially less than what Vitka was being paid as a special police officer, he worked as a school security guard for just a few months. In January, 2017, Vitka secured employment with the Naugatuck Police Department. In contrast to Vitka, Forestier was not able to bump into another position after he was laid off. In March, 2017, he was hired by the Stratford Police Department.

Following the elimination of the special police officer positions by the board in 2016, NAGE filed a grievance on their behalf against the city and the board. In early 2016, as a result of financial difficulties, the city had entered into a memorandum of understanding with NAGE, thereby amending their existing collective bargaining agreement. The memorandum of understanding provided for lower to no wage increases but also provided that there would be no layoffs of unionized employees from July 1, 2016, through June 30, 2018. The grievance alleged a violation of the no layoff provision. The matter went to arbitration before an arbitration panel, which issued an award dated July 20, 2018, determining that the memorandum of understanding had been violated and ordering the reinstatement of the five special police officers.

Subsequently, the plaintiffs were notified that, to be "rehired" as police officers, they would need to attend an orientation session, submit to a background investigation and undergo certain examinations. They were also advised that, when they completed the orientation and returned to work, they would receive layoff notices, as funding had never been restored for the special police officer positions, which, effectively, had been eliminated, and the no layoff provision in the memorandum of understanding between the city and NAGE had expired on June 30, 2018, and was no longer applicable. The complaint alleges that, "[i]n order for [the] plaintiffs . . . to comply with this directive, they would have jeopardized their present employment as police officers with their respective police departments." Both Vitka and Forestier testified at their depositions that they did not attend the orientation or report to work on September 4, 2018, as directed.[7]

The plaintiffs commenced this action in 2019, alleging discrimination by the defendants in violation of § 31-290a (a). Specifically, the plaintiffs allege that they were wrongfully laid off from their positions as special police officers due to their filing of claims for workers' compensation benefits. The city and the board each filed motions for summary judgment, which the trial court granted in a single memorandum of decision. From the judgment rendered thereon, the plaintiffs appealed to this court.

We first set forth our standard of review. "The standard of review of a trial court's decision granting [a motion for] summary judgment is well established. Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The courts are in entire

agreement that the moving party . . . has the burden of showing the absence of any genuine issue as to all the material facts . . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the [nonmoving] party must present evidence that demonstrates the existence of some disputed factual issue. . . . A material fact . . . [is] a fact which will make a difference in the result of the case. . . . Our review of the trial court's decision to grant the [defendants'] motion[s] for summary judgment is plenary." (Citations omitted; internal quotation marks omitted.) *Dusto* v. *Rogers Corp.*, 222 Conn. App. 71, 87, 304 A.3d 446 (2023).

I

At the outset, we must clarify the issue that is before us in this appeal. In its memorandum of decision granting the defendants' motions for summary judgment, the court specifically stated that "[t]here is nothing before the court regarding the defendants' compliance with the [2018] reinstatement order of the [arbitration panel]. The plaintiffs' sole claim in this action is that the [board's] decision in June, 2016, to eliminate the special [police] officer positions constituted discriminatory behavior due to the plaintiffs' exercise of their rights" to workers' compensation benefits. Despite this clear statement from the court, the plaintiffs, in their appellate briefs and at oral argument before this court, have suggested that their claim of discrimination also rests on the events related to the 2018 reinstatement order of the arbitration panel and the defendants' 2018 postarbitration conduct. Moreover, the plaintiffs have interwoven arguments related to the 2018 reinstatement order and the defendants' 2018 postarbitration conduct in their appellate briefs without making any argument or claim as to why the court was incorrect in its determination that the sole claim in this action is that the elimination of the special police officer positions in June, 2016, constituted discriminatory behavior.[8]

At oral argument before this court, counsel for the plaintiffs argued that the budgetary concerns that were the basis for the 2016 layoffs related only to the 2016–2017 fiscal budget and did not exist when the plaintiffs were told in 2018 that they would again be discharged. Counsel also argued that the trial court's decision improperly focused on the defendants' explanation for the 2016 layoffs, not what happened in 2018. Those arguments prompted this court to question counsel several times regarding the trial court's statement that the sole issue before it concerned the 2016 layoffs and for counsel to clarify the adverse employment action of the defendants that was being challenged in this appeal. Counsel for the board appeared to be surprised and

confused about this issue being raised on appeal, arguing that the decision litigated, argued, and briefed before, and decided by, the trial court concerned the elimination of the special police officers positions in 2016 and the subsequent 2016 layoffs of the plaintiffs, and that the 2018 order for the reinstatement of the plaintiffs was not briefed or before the trial court, regardless of whether the complaint made allegations concerning the postarbitration conduct of the defendants.[9] Counsel for the city echoed those arguments, stating further that it was inappropriate for the plaintiffs to now raise that issue and that it would be improper for this court to consider it when it was never before the trial court and was not a basis for the appeal. The appellate briefs of the defendants do not include any discussion or arguments concerning the 2018 reinstatement order and the defendants' 2018 postarbitration conduct.

It is well established that "[w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Fraser Lane Associates, LLC* v. *Chip Fund 7, LLC*, 221 Conn. App. 451, 472, 301 A.3d 1075 (2023). "Briefs submitted to this court require rigorous legal analysis. It is not the role of this court to undertake the legal research and analyze the facts in support of a claim or argument when it has not been briefed adequately." (Internal quotation marks omitted.) *Parnoff* v. *Mooney*, 132 Conn. App. 512, 517–18, 35 A.3d 283 (2011). "In addition, briefing is inadequate when it is not only short, but confusing, repetitive, and disorganized." (Internal quotation marks omitted.) *Wells Fargo Bank, National Assn.* v. *Doreus*, 218 Conn. App. 77, 79 n.1, 290 A.3d 921, cert. denied, 347 Conn. 904, 297 A.3d 198 (2023); see also *Missionary Society of the Diocese of Connecticut* v. *Coutu*, 134 Conn. 576, 577–78, 59 A.2d 732 (1948) ("[n]o duty is imposed upon this court to search the record for support for the defendant's claim").

In their appellate briefs, the plaintiffs have neither provided any argument or analysis, nor cited to anything in the trial court record, that would demonstrate why the court was wrong in determining that the discrimination claim before it pertained only to the 2016 decision of the board to eliminate the special police officer positions. The plaintiffs also never filed a motion for reconsideration or articulation of the trial court's decision on this issue.[10] When, as here, the plaintiffs have provided no argument or analysis concerning the propriety of the court's determination that the sole issue before it pertained only to the 2016 decision of the board to eliminate the plaintiffs' positions and not to the 2018 reinstatement order of the arbitrators and what occurred thereafter, it is not the responsibility of this court to

search the record to determine whether the court's determination finds support in the record.

Moreover, the trial court expressly stated in its decision that any claim concerning the 2018 reinstatement order was not before it. Thus, the court never addressed or decided any such claim. "[T]o review such a claim on appeal would be contrary to our long-standing precedent" that "Connecticut appellate courts will not address issues not decided by the trial court." (Internal quotation marks omitted.) *Bayview Loan Servicing, LLC* v. *Gallant*, 209 Conn. App. 185, 197 n.7, 268 A.3d 119 (2021). "[B]ecause our review is limited to matters in the record, we . . . will not address issues not decided by the trial court. . . . The requirement that [a] claim be raised distinctly means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked. . . . The purpose of our preservation requirements is to ensure fair notice of a party's claims to both the trial court and opposing parties. . . . These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act." (Emphasis in original; internal quotation marks omitted.) *DiMiceli* v. *Cheshire*, 162 Conn. App. 216, 230, 131 A.3d 771 (2016). "[O]nly in [the] most exceptional circumstances can and will [an appellate court] consider a claim, constitutional or otherwise, that has not been raised *and decided* in the trial court." (Emphasis added; internal quotation marks omitted.) *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 142, 84 A.3d 840 (2014).

Again, the plaintiffs have failed to provide any analysis of why this court should consider a claim that not only was not decided by the trial court, but which the court expressly stated that it was not considering. Instead, the plaintiffs attempt to circumvent the court's determination of the plaintiffs' sole claim in this action—that the board's 2016 decision to eliminate the special police officer positions constituted discriminatory behavior—by simply burying arguments related to the 2018 reinstatement order, which were not addressed by the court, within arguments related to the board's 2016 decision, which the court did address. The plaintiffs argue in their brief that the court improperly "focused" its decision on their initial discharge in 2016, but do not provide any explanation of why or citation to the record or authority for support. Even though this court exercises plenary review of decisions granting motions for summary judgment, that does not excuse the plaintiffs from their obligation as appellants to provide this court with an adequate brief that thoroughly and clearly sets forth and addresses the specific claims that are being raised on appeal. See *Paoletta* v. *Anchor Reef Club at Branford, LLC*, 123 Conn. App. 402, 406, 1 A.3d 1238 ("[T]he parties must clearly and fully set forth their arguments in their briefs. We do not reverse

the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed." (Internal quotation marks omitted.)), cert. denied, 298 Conn. 931, 5 A.3d 491 (2010).

In the statement of issues in the plaintiffs' principal appellate brief, the plaintiffs list a single, broad issue on appeal: "Whether the trial court erred in granting summary judgment in the instant case." There are three main headings in their main brief: (1) "Nature of Proceedings/Facts"; (2) "The Trial Court Erred in Granting the Defendants' Motions for Summary Judgment"; and (3) "Material Questions of Fact Exist as to Whether the Alleged Nondiscriminatory Reasons for the Plaintiffs' Discharge Were Pretextual." There is no specifically designated section of the brief or appropriate or distinct heading addressing the issue of whether the court erred in determining that anything related to the 2018 reinstatement order was not before it and "focusing" its decision and burden-shifting analysis on the board's 2016 decision to eliminate the special police officer positions. See Practice Book § 67-4 (e).[11] Therefore, it is of no wonder that the defendants expressed surprise when this issue was raised by the plaintiffs' counsel at oral argument before this court, and why this court asked the plaintiffs' counsel for clarification as to whether the plaintiffs' appeal relates to the 2018 reinstatement order as well, despite the trial court's determination to the contrary. If the plaintiffs believe that the court was wrong to limit its decision on the motions for summary judgment to their layoffs in 2016 and to the board's 2016 decision, they should have sought an articulation of the basis for the court's decision and, at a minimum, they should have raised it as an issue under an appropriate heading in their brief, which would have clearly alerted the defendants and this court that such a claim is being raised.

This court's decision in *Weber* v. *Pascarella Mason Street, LLC*, 103 Conn. App. 710, 930 A.2d 779 (2007), provides guidance on this issue. In *Weber*, a claim being raised by the defendant on appeal was "not briefed in accordance with Practice Book § 67-4 (d) [now § 67-4 (e)] in that a proper analysis of the claim [did] not appear under an appropriate and distinct heading within the defendant's brief. Instead, the defendant discusse[d] th[e] issue in a section of its brief entitled 'NATURE OF PROCEEDINGS AND FACTS OF CASE.' " Id., 713 n.2. This court held: "The rules of appellate procedure are not abstract or technical goals; compliance with these rules is essential to the fair resolution of issues raised on appeal. A briefing strategy like that employed by the defendant is fundamentally unfair to the plaintiff and to this court. For these reasons, we decline to treat this issue as a properly asserted claim on appeal and decline to afford it review. See *Grimm* v. *Grimm*, 276 Conn. 377, 391 n.14, 886 A.2d 391 (2005) (court declines to review issue that 'is buried in the statement of facts

and is not a distinctly raised separate point on appeal'), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006); *Northeast Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 50–51, 861 A.2d 473 (2004) (noncompliance with Practice Book § 67-4 deemed basis on which to deny appellate review of claim); *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 300 n.9, 852 A.2d 703 (2004) (same); *Ramsay* v. *Camrac, Inc.*, 96 Conn. App. 190, 198 n.8, 899 A.2d 727 (court declines to review claim 'buried' in discussion of related issue and not 'distinctly raised as a separate point on appeal'), cert. denied, 280 Conn. 910, 908 A.2d 538 (2006)." *Weber* v. *Pascarella Mason Street, LLC*, supra, 713–14 n.2.

Likewise, in the present case, to the extent that the plaintiffs assert that their discrimination claim encompasses the defendants' 2018 postarbitration conduct and that the trial court improperly focused or limited its analysis of their discrimination claim to the 2016 layoffs, that claim is not properly before this court and we decline to review it. It would be fundamentally unfair to the defendants for this court to review a claim that was neither addressed nor decided by the trial court. Furthermore, the defendants objected to our consideration of the claim as it relates to the events in 2018, and the plaintiffs have not asserted the existence of any exceptional circumstances to warrant our review of a claim not decided by the trial court. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 160–61. Finally, the plaintiffs' brief fails to raise any claim challenging the court's determination that the sole issue before it concerned the board's 2016 decision. Accordingly, because the trial court, in its decision, applied the burden-shifting analysis applicable to claims of employment discrimination only in relation to the board's 2016 decision to eliminate the special police officer positions, we similarly limit our decision in part II of this opinion to the issue decided by the court, namely, whether the defendants are entitled to summary judgment with respect to the claim of employment discrimination stemming from the board's 2016 decision to eliminate the special police officer positions. To the extent that the plaintiffs refer to the defendants' 2018 conduct in arguing that the defendants' nondiscriminatory reason for laying them off in 2016 was pretextual, we address those arguments in part II B of this opinion.

II

The plaintiffs claim that the court improperly granted the defendants' motions for summary judgment because genuine issues of material fact exist as to whether (1) the plaintiffs established a prima facie case that their positions were eliminated and they were laid off in 2016 in violation of § 31-290a for exercising their rights to workers' compensation benefits, and (2) the alleged

nondiscriminatory reason given by the defendants for the plaintiffs' layoffs was pretextual. We are not persuaded.

We first set forth the following relevant legal principles related to claims of employment discrimination under § 31-290a (a), which prohibits an employer from discharging or otherwise discriminating against an employee because the employee had filed a claim for workers' compensation benefits or otherwise exercised his rights under the Workers' Compensation Act (act), General Statutes § 31-275 et seq. "The burden of proof in actions alleging a violation of § 31-290a [(a)] is well established." *Gibilisco* v. *Tilcon Connecticut, Inc.*, 203 Conn. App. 845, 859, 251 A.3d 994, cert. denied, 336 Conn. 947, 251 A.3d 77 (2021). Our Supreme Court has stated: "Ever since this court's holding in *Ford* v. *Blue Cross & Blue Shield of Connecticut, Inc.*, [216 Conn. 40, 53, 578 A.2d 1054 (1990)], we have looked to federal employment retaliation law for guidance [i]n setting forth the burden of proof requirements in a § 31-290a action . . . . In *McDonnell Douglas* [*Corp.*] v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the United States Supreme Court set forth the basic allocation of burdens and order of presentation of proof in cases involving claims of employment discrimination. The plaintiff bears the initial burden of proving by the preponderance of the evidence a prima facie case of discrimination. . . . In order to meet this burden, the plaintiff must present evidence that gives rise to an inference of unlawful discrimination. . . . If the plaintiff meets this initial burden, the burden then shifts to the defendant to rebut the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory reason for its actions. . . . If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. . . . The plaintiff then must satisfy [his] burden of persuading the factfinder that [he] was the victim of discrimination either directly by persuading the [factfinder] . . . that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." (Internal quotation marks omitted.) *Mele* v. *Hartford*, 270 Conn. 751, 767–68, 855 A.2d 196 (2004); see also *Gibilisco* v. *Tilcon Connecticut, Inc.*, supra, 859–60; *Martin* v. *Westport*, 108 Conn. App. 710, 717, 950 A.2d 19 (2008); *Kopacz* v. *Day Kimball Hospital of Windham County, Inc.*, 64 Conn. App. 263, 268, 779 A.2d 862 (2001).

"The first step in analyzing a claim under § 31-290a is to determine whether the plaintiff raised a genuine issue of material fact with respect to a prima facie case of discrimination."[12] *Gibilisco* v. *Tilcon Connecticut, Inc.*, supra, 203 Conn. App. 860. "To establish a prima facie case of discrimination under § 31-290a, the plaintiff must show that [he] was exercising a right afforded

[him] under the [act] and that the defendant discrimi-
nated against [him] for exercising that right. . . . [T]he
plaintiff must show a [causal] connection between exer-
cising [his] rights under the act and the alleged discrimi-
nation [he] suffered. Implicit in this requirement is a
showing that the defendant knew or was otherwise
aware that the plaintiff had exercised [his] rights under
the act. . . . [T]o establish [a] prima facie case of dis-
crimination, the plaintiff must first present sufficient
evidence . . . that is, evidence sufficient to permit a
rational trier of fact to find [1] that [he] engaged in
protected [activity] . . . [2] that the employer was
aware of this activity, [3] that the employer took adverse
action against the plaintiff, and [4] that a causal connec-
tion exists between the protected activity and the
adverse action, i.e., that a retaliatory motive played a
part in *the adverse employment action . . . .*" (Empha-
sis in original; internal quotation marks omitted.) *Des-
mond* v. *Yale-New Haven Hospital, Inc.*, 212 Conn. App.
274, 288, 275 A.3d 735, cert. denied, 343 Conn. 931, 276
A.3d 433 (2022).

A

In applying this burden-shifting analysis to the cir-
cumstances of the present case, the trial court stated:
"The plaintiffs argue that they have satisfied their initial
burden of demonstrating a prima facie case of discrimi-
nation, because, as they stated in their depositions, they
both filed workers' compensation claims and experi-
enced an adverse employment action shortly thereafter.
They argue that there is a causal connection between
the filing of their claims and their termination because,
in Vitka's case, there was a close temporal connection
between the two events, and, in Forestier's case, the
plaintiffs' supervisor indicated distaste for the filing of
workers' compensation claims. The defendants argue
that they have met their burden of production by dem-
onstrating, through affidavits of board members and
city and board budget statements, that the plaintiffs'
positions were eliminated (along with many other posi-
tions) due to a significant cut to the board's budget for
the 2016–2017 fiscal year. The plaintiffs then argue that
they satisfied their final burden of persuasion by demon-
strating, through their own affidavits, that the defen-
dants' explanation is merely a pretext for underlying
discrimination against those filing workers' compensa-
tion claims." The court stated further that the board
and the city both "conceded, for the purpose of their
summary judgment motions only, that the plaintiffs
have both met the first two prongs of their prima facie
cases," as each plaintiff filed a claim for workers' com-
pensation benefits, and, because of that, they alleged
that the employer was aware of those activities. For-
estier was laid off from his position in August, 2016,
which constitutes an adverse employment action,[13] and,
even though Vitka was bumped into a school security
guard position, which he worked only a few months

before voluntarily resigning, the defendants "concede[d] in their briefs supporting their motions that, for the purposes of the burden-shifting analysis, Vitka experienced an adverse employment action." They also conceded that Vitka satisfied the causal connection element to establish a prima facie case.[14]

Accordingly, the only element necessary to establish a prima facie case of employment discrimination that was at issue concerned Forestier's ability to demonstrate the fourth element—the existence of a causal connection between the protected activity and the adverse employment action.[15] After addressing the parties' arguments relating to this issue, the court concluded that "Forestier's direct evidence to support the causal connection requirement [was] particularly weak" and that the plaintiffs failed to offer "any evidence to explain why or how Grech's negative statements [could] be attributed to the defendants under the particular circumstances presented here." The court further determined that the plaintiffs presented no evidence directly contradicting the affidavits of the board members who participated in the vote to eliminate the special police officer positions, in which they stated that they had no knowledge of the identities of any of the special officers or whether any of those officers had filed workers' compensation claims. Nevertheless, the court, after stating that it was questionable whether Forestier satisfied his burden of establishing a prima facie case of employment discrimination, assumed, arguendo, that Forestier and Vitka both met their initial burden and proceeded to address the next step of the burden-shifting analysis—whether the defendants proffered a nondiscriminatory reason for why the special police officer positions were eliminated and the plaintiffs were laid off.

Although the plaintiffs claim that genuine issues of material fact exist as to whether they met their burden of establishing a prima facie case of employment discrimination under § 31-290a (a), we need not reach the merits of the claim. As was done by the trial court, we also will assume, without deciding, that the plaintiffs both met their initial burden of establishing a prima facie case.

B

The plaintiffs' next claim is that the trial court improperly granted the defendants' motions for summary judgment because genuine issues of material fact exist as to whether the alleged nondiscriminatory reason given by the defendants was pretextual. We do not agree.

In granting the defendants' motions for summary judgment, the trial court concluded that the defendants "submitted sufficient evidence with enough specificity to meet their burden of producing a nondiscriminatory explanation for the decision to remove the funding of

the special police officers' positions from the budget." As the court explained: "The defendants have proffered a nondiscriminatory reason for not funding the special police officer positions. A significant part of the board's yearly budget is met by funds provided by the city. The defendants state that the city council's failure to increase the board's 2016–2017 fiscal year budget caused a financial crisis that the board was required to address, and [that] not funding special police officer positions was just one of the budget items cut in order to address the shortfall. The defendants supported this explanation through board member affidavits, the 2016–2017 fiscal year budget for the board, and the minutes of the board's budget meeting on June 27, 2016, addressing the budget cuts. This evidence indicates that the board requested an increase of $21.1 million for the fiscal year. The city council not only denied this request but did not approve any increase to the board's fiscal budget. The board members' affidavits emphasize that their sole intention in voting to cut the special officers' positions was to reduce the budget deficit.

"Marlene Siegel, chief financial officer of the . . . school district, avers in her affidavit that the board reduced 130 nonteacher positions for the fiscal year in an attempt to close the budget deficit in order to avoid reducing the number of classroom teachers in schools. These positions included forty-seven kindergarten paraprofessionals, twenty-six home school coordinators, thirty university interns, nine district office clerical employees, five elementary school guidance counselors, one custodian, one maintenance person, and five special police officers (including the plaintiffs). The board meeting minutes also indicate that the board contemplated the labor costs of each of the cut positions and estimated that the labor cost of the five special police officers was approximately equivalent to . . . ten and [one]-half kindergarten paraprofessionals. These considerations ultimately led to a decision not to fund the five special police officer positions.

"Further support for the legitimacy of the defendants' nondiscriminatory reasoning is found in the board's June 27 meeting minutes. Board member Howard Gardner emphasized that the board financial committee's concern with the special police officer positions was not the officers themselves, but the way the positions were being managed by the city. Pereira echoed this sentiment, saying that the officers 'for the most part are wonderful, but the reality is [the board has] a $15 million deficit.' Pereira went on to say that the board originally had ten special officers in its budget in 2013, after which point five retired and weren't replaced. The remaining five were used for nonschool work, including domestic violence calls and traffic enforcement, even though the board paid the full salaries for the positions. While some board members expressed concerns about school security in the event of the elimination of the

special officer positions, board member [Andre] Baker explained that the board had lost most contact with the police department, Grech was no longer coming before the board to report on the officers, and something had to change. Pereira highlighted that the main issue was that the special officers were being directed to perform duties outside of school grounds, including sitting at the front desk of city hall. Pereira suggested an amendment to the motion to remove the five officers, which included keeping them if the city agreed to pay their salaries and agreed not to direct them to perform any nonschool related duties. The board members found this too contingent or complicated, noted the fast approaching deadline to finalize the board's budget, and passed the original motion to eliminate the officers' positions."

Having concluded that the defendants met their burden of production by producing evidence of a legitimate, nondiscriminatory reason for their actions, which rebutted the presumption raised by the prima facie case, the court shifted its focus back to the plaintiffs, who then had the burden "of persuading the [court] that [the plaintiffs were] the victim[s] of discrimination either directly by persuading the court . . . that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence" or is pretextual. (Internal quotation marks omitted.) *Kopacz* v. *Day Kimball Hospital of Windham County, Inc.*, supra, 64 Conn. App. 268; see also *Callender* v. *Reflexite Corp.*, 143 Conn. App. 351, 364, 70 A.3d 1084, cert. denied, 310 Conn. 905, 75 A.3d 32 (2013). Ultimately, the court concluded that the plaintiffs failed to meet that burden because they did not submit evidence refuting the defendants' submissions, raising a genuine issue of material fact that the defendants' stated reason itself was false or pretextual, or indicating that the board's 2016 decision to eliminate the special officer positions was retaliatory or linked to statements made by Grech.[16] For that reason, the court determined that the plaintiffs "failed to establish the existence of material disputed facts sufficient to refute the defendants' legitimate, nondiscriminatory reason" for the termination of the plaintiffs' employment and failed to provide "any evidence beyond speculation and factual assertions in opposition to the evidence submitted by the defendants . . . ."

On the basis of our plenary review of the evidence submitted in support of and in opposition to the motions for summary judgment, we agree with the court's conclusions that the defendants successfully rebutted the presumption of discrimination and that the plaintiffs failed in their burden of producing evidence to show the existence of a genuine issue of material fact that the nondiscriminatory reason offered by the defendants was not worthy of credence or was pretextual.

The documentary evidence submitted by the defendants in support of their motions for summary judgment[17] provides substantial support for the defendants' asserted nondiscriminatory reason for eliminating the special police officer positions and laying off the plaintiffs in 2016. Siegel, the chief financial officer for the school district, attested that the board faced a financial crisis for the fiscal year 2016–2017 due to the fact that there was essentially a zero increase in its operating budget for that fiscal year, which resulted in a budget gap of almost $16 million. The budgetary figures to which Siegel attested were substantiated by the budget detail for the board that was submitted by the defendants. Siegel further attested that the reason for eliminating the funding for the special police officer positions was "[t]o close the budget deficit without reducing the number of classroom teachers . . . ." To that end, the special police officer positions were not the only ones eliminated. In fact, 130 nonteacher positions in total were eliminated for the fiscal year 2016–2017.

The minutes of the June 27, 2016 meeting and the affidavits of five of the board members who participated in that meeting provide further support for the defendants' assertion that the special police officer positions were eliminated for financial reasons. A review of the minutes of that meeting demonstrates that the motivating factor behind the vote to eliminate the special police officer positions was budget related. Although concerns were expressed about the fact that the special police officers had assumed new duties unrelated to the schools, board member Gardner reported for the finance committee of the board and its recommendation to eliminate the special police officer positions from the 2016–2017 budget. An analysis prepared by the finance committee was distributed to the board members, which showed that the special police officers collectively made $492,000 a year, not including overtime, and that that amount was going to be directed back into schools. Board member Kevin McSpirit commented that $492,000 "is ten and [one]-half kindergarten paraprofessionals," while Sauda Efia Baraka expressed her opinion that "the board could not start the fiscal year with a deficit."

Nowhere in this discussion was anything mentioned related to workers' compensation, the defendants or any work-related injuries. Indeed, the affidavits from five of the board members who participated in the vote to eliminate the positions confirmed that the plaintiffs' workers' compensation claims were not a factor in their decision. For example, Pereira attested that "[t]he five special officer positions were cut as a line item from the [b]oard's fiscal year 2016–2017 budget solely for the purpose of reducing the budget deficit. The elimination of the labor cost of the five [special police officer positions] from the budget reduced the deficit by approxi-

mately half a million dollars. On June 2[7], 2016, when I voted in favor of the motion to eliminate the five special officer positions from the [b]oard's 2016–2017 budget, I had no knowledge any of the five individuals who occupied those positions had filed a workers' compensation claim or otherwise exercised rights under the . . . [a]ct. The only reason the five special officer positions were cut from the budget was financial to reduce the massive budget deficit." Similarly, Baraka attested that when she voted in favor of the motion to eliminate the special police officer positions from the budget, she "had no knowledge any of the five persons who were then special officers either had filed a claim for workers' compensation benefits or was in the process of filing such a claim. The topic of workers' compensation was not mentioned by any other [b]oard member during the discussion concerning [the] motion." Baraka further attested that, "[i]n defunding the five special officer positions, [her] sole motivation and goal was to reduce the significant budget gap in a way that would not affect the learning of [the] students." Baker, Benjamin Walker and Joseph Larcheveque all made similar attestations about the basis for their vote and the lack of knowledge that any workers' compensation claims had been filed by any of the special police officers.

We conclude that the evidence submitted in support of the defendants' motions for summary judgment provides uncontroverted support for the defendants' assertion that the funding for the special police officer positions was eliminated in 2016 due to financial considerations.

Furthermore, after examining the evidence submitted by the plaintiffs in opposition to the motions for summary judgment,[18] we conclude that the plaintiffs did not meet their burden of demonstrating a genuine issue of material fact that the legitimate, nondiscriminatory reason offered by the defendants was not worthy of credence or was pretextual. Once the defendants presented evidence of a legitimate, nondiscriminatory reason for eliminating the subject positions, it was incumbent on the plaintiffs to refute that evidence. The plaintiffs, however, provided no evidence contradicting the affidavits submitted by the defendants or showing any connection whatsoever between the board's decision to defund and eliminate the special police officer positions and the plaintiffs' filing of claims for workers' compensation benefits. Significantly, both Vitka and Forestier testified at their depositions that their claim of retaliatory discrimination for having filed claims for workers' compensation benefits was based *solely* on the negative comments made by Grech concerning workers' compensation. Much of the evidence submitted by the plaintiffs substantiates their claim that Grech held a personal animosity toward employees who file workers' compensation claims. That evidence, however, does not establish any link between Grech's nega-

tive statements and the alleged adverse employment action of the defendants, or explain how Grech's comments could even be attributed to the defendants. The fact that Grech, at one time, attended board meetings regularly and delivered a monthly school security report to the board members does not support an inference that he also told those board members which, if any, of the special police officers had filed claims for workers' compensation benefits or that he had any type of control over the decision-making responsibilities of the board members. Any suggestion to that effect is entirely speculative. More importantly, the evidence submitted by the plaintiffs simply does not establish or even suggest that the defendants' stated nondiscriminatory reason was false or pretextual.

In contrast to the significant amount of evidence submitted by the defendants establishing that the board members knew nothing about the negative statements made by Grech to the plaintiffs and indicating that the need to fix the budget deficit was the sole basis for the decision to eliminate funding for the special police officer positions, the plaintiffs provided no evidentiary support for their assertion that the board's decision was retaliatory in nature and connected with their protected status under § 31-290a (a). The plaintiffs make a number of assertions in their principal appellate brief concerning the reason for the elimination of their positions and that the defendants' nondiscriminatory reason "is false" and "was a pretext," without providing a clear explanation for the basis of those statements, except to suggest that because the city needed police coverage, there was work for the plaintiffs to perform and they did not need to lose their jobs. The plaintiffs also argue that the defendants' 2018 postarbitration conduct further demonstrates that their asserted nondiscriminatory reason for laying them off in 2016 was pretextual.[19] The plaintiffs' assertions are conclusory and speculative[20] and are not sufficient to create a genuine issue of material fact to defeat summary judgment, especially when it is undisputed that the defendants treated all of the special police officers the same.

"[I]t is axiomatic that in order to successfully oppose a motion for summary judgment by raising a genuine issue of material fact, the opposing party cannot rely solely on allegations that contradict those offered by the moving party . . . such allegations must be supported by counteraffidavits or other documentary submissions that controvert the evidence offered in support of summary judgment." (Internal quotation marks omitted.) *TD Bank, N.A.* v. *Salce*, 175 Conn. App. 757, 766, 169 A.3d 317 (2017). "Although the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion . . . a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . A party opposing a motion

for summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Internal quotation marks omitted.) *Perez* v. *Metropolitan District Commission*, 186 Conn. App. 466, 476, 200 A.3d 202 (2018).

Accordingly, the plaintiffs failed to establish an issue of fact concerning the defendants' reason for defunding and eliminating the special police officer positions sufficient to preclude summary judgment. See *Morrissey-Manter* v. *Saint Francis Hospital & Medical Center*, 166 Conn. App. 510, 538, 142 A.3d 363 (plaintiff did not create genuine issue of material fact that defendants were negligent when allegation of negligence was supported by speculation and not by evidence submitted in opposition to motion for summary judgment), cert. denied, 323 Conn. 924, 149 A.3d 982 (2016). Therefore, the trial court properly granted the defendants' motions for summary judgment.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In this opinion, we refer to Forestier and Vitka individually by name where necessary and collectively as the plaintiffs.

[2] The Department of Labor Relations for the City of Bridgeport (department) was also named as a defendant in this action but did not file a motion for summary judgment. Although there is no final judgment as to the department being appealed in this matter, the department and the city filed a combined appellees' brief. The department's participation in this appeal as an appellee is proper pursuant to Practice Book § 60-4, which defines an appellee to mean "all other parties in the trial court at the time of judgment, unless after judgment the matter was withdrawn as to them or unless a motion for permission not to participate in the appeal has been granted by the court." See also *Paluha* v. *Braverman Group, LLC*, 80 Conn. App. 620, 621 n.1, 836 A.2d 1219 (2003) (noting that defendant against whom no judgment had been rendered "joined the remaining defendants in the brief filed in this appeal" pursuant to Practice Book § 60-4). In this opinion, however, our references to the defendants are to the city and the board only.

[3] General Statutes (Rev. to 2015) § 31-290a (a) provides: "No employer who is subject to the provisions of this chapter shall discharge, or cause to be discharged, or in any manner discriminate against any employee because the employee has filed a claim for workers' compensation benefits or otherwise exercised the rights afforded to him pursuant to the provisions of this chapter." Our references in this opinion to § 31-290a (a) are to the 2015 revision of the statute.

[4] In contrast, police officers with the Bridgeport Police Department were members of a different union, namely, Local 1159, Council 4, AFSCME, AFL-CIO.

[5] Grech's supervisory responsibilities over the special police officers included maintaining their work schedules, disciplining the officers, and authorizing any absences, vacations, or overtime. He also reviewed and approved performance reports for the special police officers.

[6] According to an affidavit of Marlene Siegel, the chief financial officer of the school district, the operating budget for the fiscal year 2015–2016 totaled $227,519,364. Despite a requested budget increase for the fiscal year 2016–2017 of $21 million, the Bridgeport City Council (city council) adopted a budget for the fiscal year 2016–2017 of $226,673,914, which amounted to $845,450 less than the budget for the prior year. Subsequently, the city council approved an additional appropriation to the board of $905,000, which increased the operating budget for the fiscal year 2016–2017 to $227,578,914, just $59,550 more than the prior year's budget. Siegel characterized that increase as an "essentially zero increase" to the operating budget.

[7] It does not appear from the record that the plaintiffs actually were laid off again in 2018, despite the plaintiffs' references in their briefs to their 2018 discharge.

[8] For example, in the part of their brief discussing the causal connection element of a prima facie case, the majority of which focuses on the elements of a prima facie case with respect to the 2016 decision of the board to eliminate their positions, the plaintiffs assert that the court improperly focused solely on the date of Forestier's injury in 2014 and "the date of his initial discharge in June, 2016. . . . The court found that the 'two year' gap was too long to support a temporal relationship to his initial discharge in 2016 and subsequent discharge in 2018 when he was reinstated by the arbitration award." (Citation omitted.) Notably, though, the plaintiffs made that statement in the context of arguing that Forestier continued to need treatment for his work-related injury even after his discharge in 2016 and, thus, that the court's determination that a two year gap was too long to support a temporal relationship for purposes of establishing a prima facie case was inappropriate. In this opinion, however, we have assumed, without deciding, that the plaintiffs both established a prima facie case.

Thereafter, in arguing that an issue of fact exists as to whether the defendants' nondiscriminatory reason was pretextual, the plaintiffs assert: "The defendants' reasoning of the lack of coverage under the [board's] budget and the expiration of the memorandum of understanding precluding the city . . . from laying off members of the [plaintiffs' union] having expired June 30, 2018, does not provide a legitimate nondiscriminatory explanation for the decisions taken by the defendants." In their reply brief, they argue further that "a material question of fact was created as to whether the reason for [their] discharge was a pretext. But contrary to this claim of budgetary cutbacks by the defendants, the only evidence presented by the defendants was an issue of budgetary cutbacks for the fiscal year of [2016–2017] . . . . Contrary to the defendants' arguments, the plaintiffs were reinstated pursuant to an [arbitration] decision dated July 20, 2018 . . . which would not include the fiscal year 2016 or the alleged budgetary cutbacks of the fiscal year 2016. The defendants' argument of budgetary cutbacks for the fiscal year of 2016 would not pertain as a legitimate basis to discharge the plaintiffs when they were reinstated in August, 2018, pursuant to an arbitration decision." Finally, the plaintiffs suggest that Grech was involved in the plaintiffs' grievance process when the plaintiffs were not reinstated after the arbitration award of July, 2018.

[9] We note that the complaint does include references to the 2018 reinstatement order and the defendants' 2018 postarbitration conduct. Nevertheless, as we have indicated, if the plaintiffs believe that the court was wrong to limit its decision to the 2016 matters, it was incumbent on the plaintiffs to properly raise and argue such a claim on appeal, which they have failed to do.

[10] The plaintiffs never sought an articulation of the reason why the court determined that "[t]here [was] nothing before [it] regarding the defendants' compliance with the [2018] reinstatement order" of the arbitration panel. In their memoranda of law in support of their objections to the motions for summary judgment, the plaintiffs argued that they were required to be reinstated to their former positions with the defendants and that the defendants, by failing to do so, improperly failed to comply with the arbitration award. The plaintiffs further asserted that they were entitled to receive what the award directed, and that another grievance had been filed and a hearing held on October 5, 2018, concerning the 2018 arbitration award and the defendants' conduct afterward, although there is no indication in the record of the result of that grievance or whether a decision thereon is pending. Although we do not know the basis for the court's determination not to address the 2018 arbitration award, we do note that "[i]t is well settled under both federal and state law that, before resort to the courts is allowed, an employee must at least attempt to exhaust exclusive grievance and arbitration procedures, such as those contained in the collective bargaining agreement between the defendant and the plaintiffs' union. . . . Failure to exhaust the grievance procedures deprives the court of subject matter jurisdiction. . . . The purpose of the exhaustion requirement is to encourage the use of grievance procedures, rather than the courts, for settling disputes. A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. . . . [I]t would deprive [the] employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances." (Internal quotation marks omitted.) *International Assn. of EMTs & Paramedics, Local R1-701* v. *Bristol Hospital EMS, LLC*, 222 Conn. App. 178, 189, 304 A.3d 170 (2023). In the present case, given that a grievance had been filed concerning the 2018 arbitration award and the defendants' 2018 postarbitration conduct, the plaintiffs were required

to exhaust their administrative remedies concerning that grievance and it would not have been appropriate for the court to address their claims relating to the 2018 arbitration award to the extent an administrative proceeding concerning that grievance was still pending. Moreover, although the plaintiffs, after exhausting their administrative remedies, could bring an action in the Superior Court seeking to enforce the 2018 arbitration award; see *Spearhead Construction Corp.* v. *Bianco*, 39 Conn. App. 122, 132, 665 A.2d 86, cert. denied, 235 Conn. 928, 667 A.2d 554 (1995); the present action was brought in a single count alleging discrimination on the basis of the plaintiffs' filing of workers' compensation claims, and the trial court treated it as such.

[11] Practice Book § 67-4 (e) provides in relevant part that an appellant's brief shall contain "[t]he argument, divided under appropriate headings into as many parts as there are points to be presented, with appropriate references to the statement of facts or to the page or pages of the transcript or to the relevant document. . . ."

[12] We note that, in the context of summary judgment, "regardless of [*McDonnell Douglas*'] burden-shifting framework, it is axiomatic that a defendant seeking summary judgment bears the burden to show the absence of a genuine fact issue for trial. . . . Accordingly, the burden [is] properly placed on [the defendant] to show the absence of a genuine fact issue . . . ." (Citations omitted.) *Peterson* v. *Connecticut Light & Power Co.*, United States District Court, Docket No. 3:10-cv-02032 (JAM), 2014 WL 2615363, *2 (D. Conn. June 12, 2014).

[13] "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. . . . To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. . . . [A]n adverse employment action [has been defined] as a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (Internal quotation marks omitted.) *Desmond* v. *Yale-New Haven Hospital, Inc.*, supra, 212 Conn. App. 289.

[14] Specifically, the defendants conceded that there was indirect evidence to satisfy the causation element, namely, Vitka's position was defunded in June, 2016, within two months after he returned to work from his work-related injury in May, 2016, as those two events were sufficiently close in time for purposes of establishing causation indirectly. See footnote 8 of this opinion.

[15] "The causation element can be proven (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant. . . . Alternatively, causation may be satisfied by showing a sufficiently close temporal connection between the protected activity and the adverse action . . . ." (Internal quotation marks omitted.) *Gibilisco* v. *Tilcon Connecticut, Inc.*, supra, 203 Conn. App. 861.

[16] As the court explained: "The plaintiffs' allegation that the board's decision to eliminate the plaintiffs' positions was linked in some way to their protected status under § 31-290a also has no evidentiary support based on what they have submitted to the court. More specifically, the affidavits of Babey, Vitka, and Forestier indicate that Grech regularly gave general status reports of the special police officers at board meetings, but this information does not specifically reflect [that] Grech said anything to the board about the defendants' worker[s'] compensation claims or that any relevant decisions made by the board were connected to these claims. The plaintiffs' statements in their affidavits that the board 'could have' voted to retain the five special police officers' positions are correct, but provide nothing as to discriminatory animus, and the plaintiffs' statements that the board eliminated the positions without explanation is simply wrong. The defendants' submissions provide such explanations.

"For example, in addition to the minutes of the board previously discussed, Pereira attests that after the motion was made to eliminate the five special police officers' positions to manage the board's budget deficit, she moved to amend the motion in a way that would keep the five special police officer positions, as long as the city funded the entire amount of their labor costs and stopped directing them to perform work not directly related to Bridgeport public schools. She then proposed to amend the motion to eliminate all five positions, thereby reducing the budget deficit by half a million dollars, subject to the condition that if the city funded the five positions and agreed

not to direct the officers to perform any work not benefitting the Bridgeport public school children and staff, the board would automatically restore the five positions without a meeting. However, because this alternative was discussed as being too contingent and complicated, the amended motion was withdrawn, and the original motion was voted on and passed. The plaintiffs have not submitted anything to challenge or dispute the explanation of the board's actions based on the events that transpired at the board meeting. The plaintiffs have made conclusory statements to support their position, but they have not provided any evidence, either direct or indirect, sufficient to defeat the defendants' summary judgment motions."

[17] In support of its motion for summary judgment, the board submitted an affidavit of Marlene Siegel, the chief financial officer of the Bridgeport school district; the budget adopted by the mayor for the fiscal year 2016–2017; the budget detail for the board; a copy of the text of General Statutes (Rev. to 2015) § 10-262j, which sets forth the state's minimum budget requirements for public schools; a chart of the position reductions for the school district for fiscal years 2016–2017, 2017–2018, and 2018–2019; an affidavit of Janene Hawkins, the Director of Labor Relations for the city from 2015 to 2019; a copy of the collective bargaining agreement between the city and the plaintiffs' union; an affidavit of John McLeod, the clerk for the board responsible for the board's meeting minutes, along with his certification attesting to the truth of the June 27, 2016 meeting minutes; the June 27, 2016 meeting minutes of the board; affidavits from five board members who were present at the June 27, 2016 meeting and participated in the vote to eliminate the special police officer positions, including Maria Pereira, Andre Baker, Sauda Efia Baraka, Benjamin Walker, and Joseph Larcheveque; an affidavit from Rebeca Garcia, a Bridgeport police officer; and transcripts of the deposition testimony of the plaintiffs. The city also submitted documentary evidence in support of its motion for summary judgment, including transcripts of deposition testimony of the plaintiffs; the budget adopted by the mayor for the fiscal year 2016–2017; the budget detail for the board; and affidavits from Garcia, Hawkins, Siegel, Pereira, Baraka, Baker, Walker, Larcheveque and Grech.

[18] The evidence submitted by the plaintiffs in opposition to the motions for summary judgment included a copy of a letter to Forestier from the Office of Labor Relations concerning his return date; the state's rehiring/reinstatement procedures; a copy of the union grievance complaint form and subsequent arbitration award; the text of statutes governing grievance and arbitration procedures; communications regarding the staffing of the special police officers; rescission of layoff letters to the plaintiffs following the arbitration award in their favor; minutes of the board's meetings from November 25, 2013, February 12, 2014, September 15, 2014, and April 6, 2016; a copy of the settlement agreement between the city and the union; a newspaper article addressing police officer staffing; copies of the plaintiffs' police department identification cards; and affidavits of Vitka, Forestier, and Babey.

[19] See footnote 9 of this opinion.

[20] For example, in their principal appellate brief, the plaintiffs argue that "Forestier's ongoing need for medical treatment *may have* substantially increased the defendants' inclination to retaliate against [Forestier] and terminate [his employment]." (Emphasis added.) They also argue that "[t]he defendants' contention that the plaintiffs were discharged due to financial considerations is false." They have provided no evidence supporting these speculative arguments, only a suggestion that there was a close period of time between when the plaintiffs filed for workers' compensation benefits and their subsequent discharge. Moreover, the plaintiffs rely on statements in their affidavits that the defendants *could have* done things differently and retained their positions, despite the budgetary issues. Those statements, even if true, do not demonstrate that the positions were eliminated as a result of a discriminatory motive. Finally, the plaintiffs make the conclusory statement in their appellate brief, without support in the record or further explanation, that "[t]he defendants' claim that the plaintiffs' job[s] [were] eliminated and even that there was a reduction in force are simply not the real reasons for the plaintiffs' discharge."

---