******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# FRANTZ CATOR *v.* COMMISSIONER
# OF CORRECTION
## (AC 46542)

Clark, Westbrook and Prescott, Js.

*Syllabus*

The petitioner, who previously had been convicted of felony murder and other crimes in connection with a shooting incident, appealed following the denial of his petition for certification to appeal from the judgment of the habeas court denying his petition for a writ of habeas corpus. He claimed, inter alia, that the court had improperly rejected his contention that his criminal trial counsel and counsel in three prior habeas actions he filed had rendered ineffective assistance. *Held*:

The habeas court abused its discretion in denying the petitioner certification to appeal, the court having improperly dismissed the first count of his habeas petition because the due process claims it raised could have been resolved by a court in a different manner.

The habeas court properly dismissed on the ground of res judicata the third count of the petitioner's habeas petition, which alleged a claim of ineffective assistance on the part of his criminal trial counsel that had been rejected in a prior habeas petition that sought the same relief.

The petitioner was not entitled to a remand of his case to the habeas court for further proceedings; although the court incorrectly dismissed the first count of his habeas petition on the ground of res judicata, its concurrent rejection of that count's due process claims on their merits constituted an alternative basis for affirming the judgment as to that count.

This court discerned no clear error in the habeas court's finding that, during the petitioner's criminal trial, no in-chambers discussion occurred from which the petitioner had been excluded, and, accordingly, the petitioner failed to establish the factual predicate for his claim that he was unconstitutionally excluded from a critical stage of the proceedings.

The petitioner was not prejudiced by his first habeas counsel's failure to claim under *Brady* v. *Maryland* (373 U.S. 83) that the state had improperly failed to disclose to him a codefendant's written statement to the police that became known after the jury returned its verdict in the petitioner's criminal trial, as the statement was not material within the meaning of *Brady*.

The petitioner could not have been prejudiced, as he claimed, by his first habeas counsel's failure to plead and prove that the petitioner had been improperly excluded from an alleged in-chambers discussion during his

criminal trial, as the habeas court's finding that no such in-chambers conference occurred was not clearly erroneous.

The habeas court correctly concluded that, because the petitioner's claims against his first habeas counsel lacked merit, the petitioner failed to establish that counsel in his second and third habeas actions had rendered ineffective assistance by failing to plead and prove that counsel in his first habeas action was ineffective, and, accordingly, there was no reasonable probability that he would have prevailed in his second or third habeas actions.

Argued September 19—officially released December 10, 2024

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Newson, J.*; thereafter, the petitioner withdrew the petition in part; judgment denying the petition; subsequently, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Affirmed.*

*Naomi T. Fetterman*, assigned counsel, for the appellant (petitioner).

*Linda F. Rubertone*, senior assistant state's attorney, with whom, on the brief, was *Patrick B. James*, former deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

CLARK, J. The petitioner, Frantz Cator, appeals from the judgment of the habeas court denying his third amended petition for a writ of habeas corpus (operative petition). The petitioner claims that the court abused its discretion by denying him certification to appeal from its judgment (1) dismissing the first and third counts of his operative petition, which alleged due process violations and ineffective assistance of trial counsel, respectively; (2) rejecting his claim that he was improperly excluded from a critical stage of the proceedings during his criminal trial; (3) concluding that he had failed to establish that his first habeas counsel

rendered ineffective assistance by failing to plead and prove a *Brady*[1] claim and that he had been excluded from a critical stage of his criminal trial; and (4) determining that he had failed to demonstrate that his second and third habeas counsel were ineffective for failing to plead and prove the aforementioned ineffectiveness claims against his first habeas counsel. Although we agree with the petitioner that the habeas court abused its discretion in denying him certification to appeal, we affirm the court's judgment on its merits.

The following facts and procedural history are relevant to this appeal. On October 21, 1997, following a jury trial, the petitioner was convicted of felony murder in violation of General Statutes § 53a-54c,[2] murder in violation of General Statutes § 53a-54a (a), conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a (a), kidnapping in the second degree in violation of General Statutes § 53a-94 (a), conspiracy to commit kidnapping in the second degree in violation of §§ 53a-48 and 53a-94 (a), and his sentence was enhanced for the commission of a class A, B or C felony with a firearm in violation of General Statutes § 53-202k. On March 6, 1998, the court, *Ford, J.*, sentenced the petitioner to fifty-five years of incarceration, suspended after fifty years, followed by five years of probation. The state then moved to correct the petitioner's sentence on the ground that the imposition of probation was improper and that the proper calculation of the petitioner's total effective sentence was sixty-five years. The court granted the motion and, on October 8, 1999, corrected the petitioner's total effective sentence to fifty years of incarceration without any period

---

[1] See *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[2] General Statutes § 53a-54c was amended by No. 15-211, § 3, of the 2015 Public Acts, which made technical changes to the statute that are not relevant to this appeal. In the interest of simplicity, we refer to the current revision of § 53a-54c.

of probation. The petitioner appealed to our Supreme Court, which reversed the trial court's judgment in part and remanded the case to that court with direction to vacate the petitioner's conviction under § 53-202k, and to merge his conspiracy convictions and to impose a single sentence on those counts. See *State* v. *Cator*, 256 Conn. 785, 812–13, 781 A.2d 285 (2001). On May 13, 2003, pursuant to the court's remand order, the petitioner was resentenced to a total effective sentence of forty-five years of incarceration.

The jury reasonably could have found the following facts, as stated by our Supreme Court in the petitioner's direct appeal. "Desmond Hamilton, [the petitioner] and the victim, Nathaniel Morris, all knew each other and had participated in the sale of drugs together. On May 10, 1996, on Laurel Court, a dead-end street in Bridgeport, [the petitioner] and Hamilton had a discussion concerning both money that Hamilton owed [the petitioner] and a gun of [the petitioner's] that he had given to Hamilton approximately two weeks earlier. Also present during the conversation were the victim, and McWarren St. Julien. [The petitioner] also questioned the victim about the whereabouts of the gun. During the conversation, [the petitioner] became upset, began yelling and pulled out a Glock .40 handgun. Police officers subsequently came to the location of the conversation, but when they arrived [the petitioner] was no longer there. Later that night, Hamilton called [the petitioner] to attempt to explain that he did not know where the gun was located, and that he would never steal from [the petitioner]. [The petitioner] told Hamilton that he wanted him 'to get everything straight.'

"On the following day, May 11, 1996, Hamilton again called [the petitioner], who told Hamilton that he was going to meet Hamilton at Hamilton's mother's house, and that the two men would go together to find the victim to learn what had happened to the gun. Later

that evening, [the petitioner] picked up Hamilton and they proceeded to 244 Olive Street in Bridgeport, where Hamilton, the victim, Tamara Addison and Terrance Addison lived. At 244 Olive Street, [the petitioner], the victim, St. Julien, Hamilton, Hamilton's mother, Tamara Addison and Terrance Addison were on the front porch of the house. There [the petitioner] asked the victim about the whereabouts of his gun that had been the topic of the May 10 discussion. At or about the same time, Rodolphe St. Victor arrived at the house. [The petitioner] and St. Julien then left the porch as St. Victor forcibly pulled the victim off the porch. As [the petitioner] and St. Julien proceeded to enter a blue Oldsmobile parked in the driveway of the house, St. Victor grabbed the victim by the sleeve and said 'Come on. [The petitioner] wants to talk to you.' St. Victor then forced the victim into the Oldsmobile, which [the petitioner] then drove away. People at the house contacted the Bridgeport police out of concern for the victim's safety. The police came to the house and, after speaking with the people there, left in search of the blue Oldsmobile. Later that evening, [the petitioner], St. Julien and St. Victor returned to 244 Olive Street in the blue Oldsmobile. The police arrived shortly thereafter and arrested the three occupants of the vehicle and recovered a gun from it. [The petitioner], St. Julien and St. Victor then were taken to the Bridgeport police station. Thereafter, St. Victor and three Bridgeport police detectives left the Bridgeport police station and St. Victor directed the police to Suggetts Lane, Bridgeport, where the victim was found, conscious but unable to speak, with a gunshot wound to the back of his neck. The police summoned medical personnel, who took the victim to Bridgeport Hospital, where he died. Tests conducted on the gun recovered from the car revealed that the bullet that killed the victim had been fired from it. The murder weapon was a Mac-10 automatic pistol

modified with a shell catcher to retain spent bullet casings and a handle to prevent shaking when the gun was fired rapidly. This weapon belonged to [the petitioner], and he often carried it with him." Id., 789–91.

St. Victor and St. Julien were also prosecuted for their involvement in the victim's death. Following a jury trial, St. Victor was convicted of one count of conspiracy to commit kidnapping in the first degree in violation of §§ 53a-48 and 53a-92 (a) (2) (A), and acquitted on one count of kidnapping in the first degree in violation of § 53a-92 (a) (2) (A). The day after the petitioner's conviction, St. Julien pleaded guilty under the *Alford* doctrine[3] to conspiracy to commit kidnapping in the second degree in violation of §§ 53a-48 and 53a-94 (a). A fourth codefendant, Peter Johnson, was also arrested and prosecuted for the murder of the victim but was acquitted on all charges[4] after a jury trial on March 2, 2001.

The petitioner has previously, and without success, litigated three other petitions for a writ of habeas corpus to decision after trials on the merits.[5] See *Cator* v. *Warden*, Docket No. CV-01-0810396-S, 2004 WL 503831 (Conn. Super. February 25, 2004) (*Fuger, J.*), appeal

---

[3] See *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). "A defendant who pleads guilty under the *Alford* doctrine does not admit guilt but acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea." (Internal quotation marks omitted.) *State* v. *Webb*, 62 Conn. App. 805, 807 n.1, 772 A.2d 690 (2001).

[4] Johnson had been charged with murder in violation of § 53a-54a (a), kidnapping in the second degree in violation of § 53a-94 (a), felony murder in violation of § 53a-54c, capital felony in violation of General Statutes (Rev. to 1995) § 53a-54b (5) and conspiracy to commit murder in violation of §§ 53a-48 and 53a-54a.

[5] The petitioner also filed a petition for a writ of habeas corpus in 2010 but withdrew it prior to trial. See *Cator* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-10-4003845-S (March 21, 2013). In the interest of clarity, when discussing the petitioner's first, second, and third habeas proceedings and habeas counsel in this opinion, we refer only to those three prior habeas petitions that were decided after trials on the merits.

dismissed, 92 Conn. App. 241, 884 A.2d 447 (2005), cert. denied, 276 Conn. 936, 891 A.2d 1 (2006); *Cator* v. *Warden*, Docket No. CV-06-4001410-S, 2009 WL 765395 (Conn. Super. November 21, 2008)[6] (*Nazzaro, J.*), appeal dismissed, Connecticut Appellate Court, Docket No. 30804 (February 16, 2011); *Cator* v. *Warden*, Docket No. CV-14-4005876-S, 2016 WL 6603685 (Conn. Super. October 11, 2016) (*Sferrazza, J.*), appeal dismissed, 181 Conn. App. 167, 185 A.3d 601, cert. denied, 329 Conn. 902, 184 A.3d 1214 (2018). The petitioner commenced the underlying habeas action on June 12, 2017, and filed the operative eight count amended petition on September 28, 2021.

In his operative petition, the petitioner alleged: (1) his due process rights had been violated in his underlying criminal prosecution as a result of, inter alia, the prosecution's suppression of various pieces of exculpatory evidence; (2) he had been excluded from a critical stage of the prosecution; (3) his trial counsel, Kevin A. Randolph,[7] had rendered ineffective assistance; (4) he was actually innocent of the offenses of which he had been convicted; (5) his first habeas counsel, Robert J. McKay, had rendered ineffective assistance by failing to adequately plead, argue and prove the claims set forth in counts one through four; (6) his second habeas counsel, Thomas P. Mullaney III, had rendered ineffective assistance by failing to plead, argue and prove the claims set forth in counts one through five; (7) his third habeas counsel, Jason C. Goddard and Freesia Waldron, had rendered ineffective assistance by failing to plead, argue and prove the claims set forth in counts one through six and in count eight; and (8) his sentence violated his

---

[6] Judge Nazzaro rendered an oral decision denying the petitioner's habeas petition on November 21, 2008. A copy of the decision was transmitted to the Office of the Reporter of Judicial Decisions on February 19, 2009. In the Westlaw database for unreported Connecticut cases, Judge Nazzaro's decision is dated February 19, 2009.

[7] Randolph is currently a senior judge of the Superior Court.

rights to due process and to be free from cruel and unusual punishment.[8] He requested that the habeas court vacate the underlying criminal judgment and sentence and order "whatever other relief that law and justice require."

The habeas court, *Newson, J.*, held a trial on the petition on October 24 and December 19, 2022. The petitioner presented testimony from C. Robert Satti, Jr., the prosecuting attorney in his underlying criminal trial; Suzanne Zitser, who had represented the petitioner on direct appeal; Randolph; McKay; Mullaney; Goddard; and two expert witnesses, Attorneys Vishal K. Garg and Frank J. Riccio. The petitioner also submitted more than fifty exhibits into evidence. The respondent, the Commissioner of Correction, submitted no exhibits and called no witnesses.

On December 19, 2022, the court sua sponte ordered the parties to submit memoranda of law as to whether the court should dismiss one or both of counts one and four of the operative petition (which alleged due process violations and actual innocence, respectively) on the ground of res judicata pursuant to Practice Book § 23-29 (3).[9] The petitioner and the respondent filed supplemental briefs on February 3, 2023, in response to the court's order. On February 23, 2023, the court, sua sponte, further ordered that the parties were permitted to submit supplemental briefs as to why it should

---

[8] The numbering of this list corresponds to the numbering of the counts in the operative petition. The petitioner withdrew count eight on the record after the close of evidence.

[9] Practice Book § 23-29 provides in relevant part: "The judicial authority may, at any time, upon its own motion or upon motion of the respondent, dismiss the petition, or any count thereof, if it determines that . . .

"(3) the petition presents the same ground as a prior petition previously denied and fails to state new facts or to proffer new evidence not reasonably available at the time of the prior petition . . .

"(5) any other legally sufficient ground for dismissal of the petition exists."

not dismiss count three (which alleged ineffective assistance of trial counsel) pursuant to § 23-29 (3) and (5). On March 24, 2023, the petitioner filed an objection to the court's notice of its possible dismissal of his petition in its entirety or of only count three; the respondent did not file any further supplemental briefing on the issue.

On March 29, 2023, the habeas court issued a memorandum of decision dismissing counts one, three, and four of the operative petition. It denied the petition with respect to the remaining counts. The petitioner subsequently filed a petition for certification to appeal to this court, which the habeas court denied on April 10, 2023. This appeal followed. Additional facts and procedural history will be set forth as necessary.

We begin with our well established standard for review of a denial of a petition for certification to appeal. "Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [a] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and applicable legal principles. . . . If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying [claim] to determine whether

the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive [claim] for the purpose of ascertaining whether [that claim satisfies] one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification.'' (Internal quotation marks omitted.) *Hilton* v. *Commissioner of Correction*, 225 Conn. App. 309, 332–33, 315 A.3d 1135 (2024).

As we explain in part I of this opinion, we agree with the petitioner that the habeas court improperly dismissed count one of the operative petition on the ground of res judicata. Accordingly, we necessarily conclude that a court could resolve the issues in a different manner and that the habeas court thus abused its discretion in denying certification to appeal. We therefore address the petitioner's claims on their merits. See, e.g., *Williams* v. *Commissioner of Correction*, 221 Conn. App. 294, 303, 301 A.3d 1136 (2023).

I

The petitioner first claims that the habeas court erroneously dismissed counts one and three of his operative petition and requests a remand for a trial on the merits of both counts.[10] We agree that the habeas court erroneously dismissed count one. We disagree, however, that the habeas court erroneously dismissed count three. We further conclude that a remand for a trial on the merits of count one is not necessary because an alternative ground exists for denying that count.

The following additional facts and procedural history are relevant to this claim. In count one of his operative

---

[10] The petitioner does not challenge the habeas court's dismissal of count four, which alleged actual innocence.

petition, the petitioner alleged that his right to due process under the state and federal constitutions had been violated in his underlying criminal prosecution. In particular, he claimed that the state improperly had withheld various pieces of material, exculpatory evidence, namely: "(i) that the petitioner's [codefendant] St. Julien, gave a written and recorded statement to the police that was favorable to the petitioner's defense;[11] (ii) that St. Julien testified in [*State* v. *Johnson*, Superior Court, Docket No. CR-97-0135375-T], in a manner that was favorable to the petitioner's defense; (iii) that William Kamper[12] and Terrance Addison testified in [*Johnson*] in a manner that was inconsistent with their testimony in [the petitioner's trial] and favorable to the petitioner's defense; and/or (iv) information about [Kamper], [Hamilton], Terrance Addison, and Tamara Addison that could have been used by the petitioner to impeach their testimony in [his own trial] on the basis of bias and/or motive to fabricate . . . ." (Footnotes added.) He also claimed that the state had procured his conviction "by presenting a theory of the case that was materially inconsistent" with the evidence it had used in the prosecution of Johnson.

In the petitioner's first habeas petition, which sought identical relief to that sought in his operative petition in the present case,[13] he presented a claim of prosecutorial

---

[11] We discuss the details of this statement in part III of this opinion.

[12] At the petitioner's criminal trial, the state called Kamper to testify as an eyewitness to the kidnapping.

[13] Specifically, in his first habeas petition, the petitioner requested the following relief: "[1] Order a writ of habeas corpus be issued to bring [the petitioner] before this court in order that justice may be done. [2] That the convictions and sentence described herein be ordered vacated and the matter be returned to the trial court dockets for further proceedings according to law. [3] Such other relief as law and justice require." The operative petition in the present case requested that the court "issue a writ of habeas corpus: (1) vacating the judgments in [the petitioner's underlying criminal case]; (2) directing the sentencing courts to vacate the judgment in [the petitioner's underlying criminal case] within ninety days or some other certain and reasonable period of time; and (3) ordering whatever other relief that law and justice require."

impropriety, predicated on an allegation that Satti had made unjustified statements and expressed personal opinions to the jury.[14] Following the close of evidence in his first habeas trial, the petitioner withdrew his prosecutorial impropriety claim on the record after consulting with his attorney. In its memorandum of decision, the first habeas court "[found] that [the prosecutorial impropriety claim was] withdrawn with prejudice." *Cator* v. *Warden*, supra, 2004 WL 503831, *1 n.1.

In the present action, the habeas court dismissed count one of the operative petition on the ground of res judicata. The court characterized count one as also alleging prosecutorial impropriety; determined that the factual predicates of the allegations in count one could have been discovered by due diligence prior to the conclusion of the first habeas trial; and concluded that, because the first habeas court had found that the petitioner's prosecutorial impropriety claim was withdrawn with prejudice, and both the first habeas petition and the operative petition sought the same relief, res judicata barred the petitioner from litigating a second "prosecutorial impropriety" claim in the present proceeding.

Despite its dismissal of count one, however, the habeas court also considered and rejected the petitioner's due process claims in count one on the merits. Specifically, the court addressed the claim regarding St. Julien's statement to the police in the context of the petitioner's claim of ineffective assistance of his first habeas counsel. The court concluded that the statement was not material to the petitioner's guilt or innocence and, thus, that the petitioner was not prejudiced by his first habeas counsel's failure to plead a claim under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10

---

[14] Although the parties and the habeas court referred to this claim as one of "prosecutorial misconduct," it is more accurately characterized as a "prosecutorial impropriety" claim. See *State* v. *Fauci*, 282 Conn. 23, 26 n.2, 917 A.2d 978 (2007).

L. Ed. 2d 215 (1963), predicated on the statement's suppression. The court also concluded that St. Julien's testimony in Johnson's trial had not been "suppressed" because it was given in the course of a public proceeding. It further determined that the petitioner had failed to present sufficient evidence to substantiate his claims regarding Kamper, Hamilton, and Terrance and Tamara Addison—in significant part because the petitioner had not called any of these individuals to testify at his habeas trial. Finally, it concluded that the theories of prosecution used against the petitioner and Johnson were not materially inconsistent.[15]

In count three of his operative petition, the petitioner alleged that his criminal trial counsel, Randolph, had rendered ineffective assistance. Specifically, he claimed that Randolph had failed to raise and argue the claim in count two of the operative petition (exclusion from a critical stage of the proceedings); "failed to adequately present and argue the claim that Attorney [Joseph] Mirsky [the petitioner's first criminal trial counsel] had a conflict of interest when he represented both the petitioner and St. Julien during pretrial proceedings . . . failed to object to the trial court's instruction to the jury that it could find the petitioner guilty of murder based on a theory of coconspirator vicarious liability . . . failed to object to the trial court's jury instruction . . . and/or failed to ask the court to poll the jury regarding the theory under which it found the petitioner guilty of murder . . . failed to adequately cross-examine or otherwise impeach the testimony of [Terrance Addison, Tamara Addison, Kamper, and Hamilton] . . . failed to adequately investigate and/or call the following witnesses to testify [Tyler Bember, Patricia Bember,

---

[15] For reasons that are unclear, in its memorandum of decision the court addressed the remainder of the due process allegations pleaded in count one under the subheading "Count Two."

Effrain Johnson and St. Julien] . . . failed to adequately investigate the facts and circumstances of the petitioner's whereabouts, conduct, and interactions on May 11, 1996, prior to his arrival at 244 Olive Street . . . failed to adequately cross-examine and/or otherwise impeach the testimony of Edward McPhillips[16] . . . failed to object to the trial court's inaccurate and/or misleading jury instruction on the issue of specific intent . . . and . . . failed to move for a mistrial and/or disqualification based on the trial court's participation in discussions regarding a plea offer." (Footnote added.)

The habeas court also dismissed count three on the ground of res judicata. It explained that, in his first habeas petition, the petitioner had also presented an ineffective assistance of counsel claim against Randolph, though predicated on different factual allegations. The first habeas court denied that claim on the merits. See *Cator* v. *Warden*, supra, 2004 WL 503831, *7–8. The habeas court in the present case concluded that "all of the matters alleged in the current petition relate directly to information and witnesses that were known, or should have been known, through the exercise of due diligence . . . when the [first habeas] petition went to trial." It further concluded that, because the first habeas petition had also raised a claim of ineffective assistance of trial counsel and sought the same relief as the operative petition in the present case, count three was barred by res judicata.

Before examining the merits of the habeas court's dismissals of each count, we set forth the principles governing the application of res judicata in the habeas context. "The doctrine of res judicata provides that a former judgment serves as an absolute bar to a subsequent action involving any claims relating to such cause

---

[16] McPhillips was a firearms examiner with the state police forensics laboratory who testified for the state at the petitioner's criminal trial.

of action which were actually made or which might have been made. . . . The doctrine . . . applies to criminal as well as civil proceedings and to state habeas corpus proceedings. . . . However, [u]nique policy considerations must be taken into account in applying the doctrine of res judicata to a constitutional claim raised by a habeas petitioner. . . . Specifically, in the habeas context, in the interest of ensuring that no one is deprived of liberty in violation of his or her constitutional rights . . . the application of the doctrine of res judicata . . . [is limited] to claims that have actually been raised and litigated in an earlier proceeding. . . .

"In the context of a habeas action, a court must determine whether a petitioner actually has raised a new legal ground for relief or only has alleged different factual allegations in support of a previously litigated claim. . . . Identical grounds may be proven by different factual allegations, supported by different legal arguments or articulated in different language. . . . They raise, however, the same generic legal basis for the same relief. . . .

"[A] subsequent petition alleging the same ground as a previously denied petition will elude dismissal if it alleges grounds not actually litigated in the earlier petition and if it alleges new facts or proffers new evidence not reasonably available at the time of the earlier petition. . . . In this context, a ground has been defined as sufficient legal basis for granting the relief sought." (Citations omitted; internal quotation marks omitted.) *Sanchez* v. *Commissioner of Correction*, 203 Conn. App. 752, 762–63, 250 A.3d 731, cert. denied, 336 Conn. 946, 251 A.3d 77 (2021). Whether a habeas court properly dismissed a claim on the ground of res judicata is a question of law over which our review is plenary. See, e.g., *Kelsey* v. *Commissioner of Correction*, 343 Conn. 424, 435–36, 274 A.3d 85 (2022).

A

The petitioner argues that the habeas court improperly concluded that count one of the operative petition was barred by res judicata. The respondent does not challenge this argument in his brief, and, at oral argument before this court, counsel for the respondent conceded that the habeas court had incorrectly applied the doctrine of res judicata to count one. We agree with the petitioner.

Contrary to the habeas court's conclusion, count one of the operative petition does not present a claim of "prosecutorial impropriety," as that claim has been defined by our courts. To prevail on a claim of prosecutorial impropriety, a petitioner must show that there was improper conduct by the prosecutor and that such conduct deprived him of his due process right to a fair trial. See, e.g., *State* v. *Brown*, 345 Conn. 354, 384–85, 285 A.3d 367 (2022). In determining whether conduct by the prosecutor violated the petitioner's right to a fair trial, a court must conduct a multifactor analysis that considers the extent to which the improper conduct was invited by the defense; the severity of the improper conduct; the frequency of the improper conduct; the centrality of the improper conduct to the critical issues in the case; the strength of any curative measures adopted; and the strength of the state's case. See, e.g., *State* v. *Warholic*, 278 Conn. 354, 361, 897 A.2d 569 (2006).

In count one of the operative petition, the petitioner claimed that the prosecutor in the underlying criminal case violated the petitioner's due process rights by (1) suppressing material, exculpatory evidence, and (2) relying on inconsistent theories of guilt to convict the petitioner and a codefendant. Neither of these claims constitutes the same "ground" as prosecutorial impropriety because each claim requires a court to conduct

a distinct inquiry under a distinct legal standard. See, e.g., *Diaz* v. *Commissioner of Correction*, 125 Conn. App. 57, 66, 6 A.3d 213 (2010) (claims that require separate legal analyses are not identical for purposes of res judicata), cert. denied, 299 Conn. 926, 11 A.3d 150 (2011); see also *Thorpe* v. *Commissioner of Correction*, 73 Conn. App. 773, 778, 809 A.2d 1126 (2002). To prevail on a claim that the prosecutor suppressed exculpatory evidence, a petitioner must show that the prosecutor suppressed evidence, that the evidence was favorable to the defense and that the evidence was material. See, e.g., *State* v. *Ouellette*, 295 Conn. 173, 185, 989 A.2d 1048 (2010). In determining whether a prosecutor violated a defendant's right to due process by relying on inconsistent theories of guilt across related cases, a court must examine the state's arguments in each case to determine whether inconsistencies between them—if any—are inherent to the state's theory or whether the varying material facts are irreconcilable. See *Council* v. *Commissioner of Correction*, 114 Conn. App. 99, 111–12, 968 A.2d 483, cert. denied, 292 Conn. 918, 973 A.2d 1275 (2009). Though, to be sure—at a high level of generality—these claims require a court to assess the conduct of the state in conducting a criminal prosecution, they are not thereby interchangeable with a prosecutorial impropriety claim, which has a specific meaning under Connecticut law. We therefore conclude that the habeas court erroneously dismissed count one of the petition on the basis of the doctrine of res judicata.[17]

B

The petitioner also argues that the habeas court's conclusion that count three was barred by res judicata was erroneous. We disagree.[18]

---

[17] Because we agree that the petitioner's claims in count one are not identical to the prosecutorial impropriety claim that he brought in his first habeas action, we do not address his alternative challenges to the habeas court's dismissal of count one.

[18] We note that, in the petitioner's third habeas action, he also presented a claim of ineffective assistance of trial counsel against Randolph, which

Although the petitioner acknowledges having previously litigated a claim of ineffective assistance against Randolph in his first habeas action, he argues that the ineffectiveness claim in count three of the operative petition should not have been dismissed on the ground of res judicata because the specific factual allegations that he raised in his operative petition were not pleaded, litigated, or decided on the merits in his first or any other habeas petition. This court, however, has "rejected this argument on numerous occasions." *Tatum* v. *Commissioner of Correction*, 211 Conn. App. 42, 50, 272 A.3d 218 (2022), rev'd in part on other grounds, 349 Conn. 733, 322 A.3d 299 (2024). Even if a subsequent petition sets forth different specific factual allegations to support a claim of ineffective assistance of trial counsel, the claim remains the same for res judicata purposes so long as the petitioner seeks the same relief and does not allege newly available facts or evidence not reasonably available at the time of the prior petition. See id., 51–53; see also, e.g., *Damato* v. *Commissioner of Correction*, 156 Conn. App. 165, 174, 113 A.3d 449 ("[a]lthough we recognize that the petitioner sets forth *different allegations* in support of his claim of ineffective assistance, the claim is still one of ineffective assistance of counsel involving [trial counsel]" (emphasis in original)), cert. denied, 317 Conn. 902, 114 A.3d 167 (2015). The petitioner does not dispute that his current habeas petition seeks the same relief as that sought in his first petition, nor does he challenge the habeas court's conclusion that his allegations "relate directly to information and witnesses that were known, or should have been known, through the exercise in due diligence . . . when the [first habeas] petition went to trial." As such, we agree with the habeas court that the petitioner's claim of ineffective assistance against Randolph is improperly successive.

Judge Sferrazza also dismissed on res judicata grounds under Practice Book § 23-29. See *Cator* v. *Warden*, supra, 2016 WL 6603685, *1.

The petitioner insists that it was nonetheless improper for the habeas court to dismiss his ineffectiveness claim against Randolph because, to prevail on his claims of ineffective assistance of habeas counsel (counts five through seven), he necessarily had to prove that Randolph, his trial counsel, was also ineffective. Although it is true that a petitioner seeking to prevail on a claim of ineffective assistance of habeas counsel must establish both that his appointed habeas counsel and trial counsel were ineffective; see, e.g., *Harris* v. *Commissioner of Correction*, 108 Conn. App. 201, 206, 947 A.2d 435, cert. denied, 288 Conn. 911, 953 A.2d 652 (2008); it does not follow that the res judicata dismissal of a freestanding count of ineffective assistance of trial counsel automatically precludes a petitioner from proceeding on, and prevailing on the merits of, a separate claim of ineffective assistance of habeas counsel.

This court's decision in *Kearney* v. *Commissioner of Correction*, 113 Conn. App. 223, 965 A.2d 608 (2009), is directly on point. In *Kearney*, the petitioner brought a second habeas petition in which he alleged ineffective assistance of his trial counsel and ineffective assistance of his first habeas counsel. Id., 226–27. In his first habeas petition, the petitioner had also pleaded ineffective assistance of trial counsel, though without all of the same underlying factual allegations as were contained in his second petition. Id., 230–31. The second habeas court dismissed the petitioner's claim of ineffective assistance of trial counsel as barred by res judicata, and this court upheld that dismissal on appeal for the same reason that we uphold the dismissal of count three in the present case. See id., 233. The second habeas court in *Kearney*, however, further concluded that, because the petitioner's claim of ineffective assistance of trial counsel was foreclosed, his claim of ineffective assistance of habeas counsel must necessarily be dismissed as well because the latter claim required

the petitioner to prove ineffective assistance of trial counsel. See id., 237–38. This court rejected that argument, holding that, under our Supreme Court's decision in *Lozada* v. *Warden*, 223 Conn. 834, 844, 613 A.2d 818 (1992)—which had held that "[t]he claim of ineffective assistance of habeas counsel, when added to the claim of ineffective assistance of trial counsel, results in a different issue"—a habeas petitioner "is entitled to make a claim that he or she was deprived of effective habeas counsel in a prior petition . . . [and] such a claim is not subject to dismissal on the ground that an earlier habeas petition that was based on the ineffectiveness of trial counsel had been unsuccessful." *Kearney* v. *Commissioner of Correction*, supra, 239. As such, the petitioner's argument—that count three should not have been dismissed because he was required to separately plead ineffective assistance of trial counsel in order to prevail on his claims of ineffective assistance of habeas counsel—is unavailing.

C

The petitioner argues that, because count one was improperly dismissed, he is entitled to a remand to the habeas court for further proceedings on the merits of that count. Though we agree, for the reasons set forth in part I A of this opinion, that the habeas court's reasoning in dismissing count one was erroneous, we disagree that a remand is appropriate because the court's judgment as to count one may be affirmed on an alternative basis.

"[If] the trial court reaches a correct decision but on [improper] grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it. . . . [W]e . . . may affirm the court's judgment on a dispositive alternative ground for which there is support in the trial court record." (Internal quotation marks omitted.) *Green Tree Servicing, LLC* v. *Clark*, 224 Conn.

App. 740, 748, 314 A.3d 1019, cert. denied, 349 Conn. 913, 315 A.3d 300 (2024); see also *Ross* v. *Commissioner of Correction*, 337 Conn. 718, 733, 256 A.3d 118 (2021) (concluding that Appellate Court improperly determined that ineffective assistance claim was barred by collateral estoppel but nonetheless affirming judgment on alternative ground that petitioner failed to demonstrate prejudice).

As we have explained, notwithstanding its dismissal of count one, the habeas court also rejected on the merits the various due process allegations pleaded in count one. Although a court's dismissal of a claim on jurisdictional grounds deprives it of jurisdiction to consider the merits of that claim, and any further discussion of those merits constitutes dicta; see, e.g., *State* v. *Despres*, 220 Conn. App. 612, 624 n.9, 300 A.3d 637 (2023); a conclusion that a claim is barred by res judicata does not implicate the court's jurisdiction. See, e.g., *M&T Bank* v. *Lewis*, 349 Conn. 9, 19 n.6, 312 A.3d 1040 (2024). As a result, the habeas court in this case was free to consider the merits of count one after it dismissed that count on res judicata grounds, and its conclusion with respect to the merits of count one constitutes an alternative holding. Cf. *Mulvihill* v. *Spinnato*, 228 Conn. App. 781, 788 n.12,     A.3d    , cert. denied,     Conn.    ,     A.3d     (2024); see *Rosenthal Law Firm, LLC* v. *Cohen*, 190 Conn. App. 284, 293, 210 A.3d 579 (2019) (distinguishing dicta from alternative holdings and explaining that when court "has focused on the legal issue presented by the case before it and made a deliberate decision to resolve the issue, that ruling becomes the law" (internal quotation marks omitted)).

On appeal, the only portion of the habeas court's ruling on the merits of count one that the petitioner contests is its conclusion that the state's failure to disclose to him St. Julien's statement to the police did not violate the petitioner's due process rights. Because he

has not contested or even referred in his brief to the court's conclusions with respect to any of the other specific due process allegations contained in count one, he has abandoned any challenge to those portions of its ruling. See *State* v. *Saucier*, 283 Conn. 207, 223, 926 A.2d 633 (2007) (unmentioned claim is, by definition, inadequately briefed and therefore abandoned); *Forestier* v. *Bridgeport*, 223 Conn. App. 298, 314, 308 A.3d 102 (2024) ("[w]e do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed" (internal quotation marks omitted)). And for the reasons set forth in part III A of this opinion, we agree with the habeas court that the failure to disclose St. Julien's statement to the police did not violate the petitioner's due process rights. Therefore, we affirm, on an alternative basis, the habeas court's denial of relief on count one and decline to remand the case for further proceedings on the merits of that count.[19]

[19] We may generally affirm a lower court's judgment on an alternative ground so long as the appellant is not prejudiced thereby. See *State* v. *Osuch*, 124 Conn. App. 572, 580, 5 A.3d 976, cert. denied, 299 Conn. 918, 10 A.3d 1052 (2010). Under the circumstances of this case, we conclude that the petitioner would not be prejudiced by our decision to affirm the habeas court's judgment on an alternative basis. Because the habeas court set forth two independent bases for its denial of relief on count one in its memorandum of decision—res judicata and its ruling on the merits of count one—the petitioner was on notice from the moment his petition was denied that the alternative basis on which we rely to sustain the habeas court's judgment existed. Indeed, in his petition for certification to appeal (though not in his principal appellate brief), the petitioner raised several challenges to other portions of the habeas court's ruling on the merits of count one. Moreover, in his brief, the respondent argued that, even if the habeas court's res judicata dismissal of count one was erroneous, the court's ruling on the merits of the petitioner's claim pertaining to St. Julien's statement provided an alternative basis on which to sustain its judgment. Accordingly, the petitioner had a full and fair opportunity to challenge the habeas court's ruling on the merits of count one as and to the extent he believed appropriate. Cf., e.g., *Devine* v. *Fusaro*, 205 Conn. App. 554, 584 n.23, 259 A.3d 655 (2021), appeal dismissed, 346 Conn. 29, 287 A.3d 598 (2023) (certification improvidently granted); *State* v. *Martin M.*, 143 Conn. App. 140, 151–53, 70 A.3d 135, cert. denied, 309 Conn. 919, 70 A.3d 41 (2013).

## II

The petitioner next claims that the habeas court erred in rejecting his claim that, during his underlying criminal prosecution, he was improperly excluded from an in-chambers conference regarding a possible conflict of interest on the part of his counsel. He argues that his exclusion from the in-chambers conference violated his constitutional right to be present at a critical stage of the prosecution and that this violation constitutes structural error for which he need not demonstrate prejudice. We are not persuaded.

The following additional facts and procedural history are relevant to this claim. At the outset of his underlying criminal prosecution, the petitioner was represented by Mirsky.[20] Mirsky also represented St. Julien, one of the petitioner's codefendants. On July 2, 1996, the court, *Maiocco, J.*, held a joint hearing in probable cause for the petitioner and St. Julien. At the start of the hearing, Mirsky identified himself as counsel for the petitioner and St. Julien, and stated: "[A]t this time I find no conflict of interest." The court did not further inquire, during that hearing, as to the basis for Mirsky's conclusion that no conflict existed. On May 15, 1997, however, Mirsky moved to withdraw as the petitioner's counsel on the ground that "there may or could possibly arise a conflict of interest . . . ." The court, *Ronan, J.*, granted the motion on May 28, 1997, and appointed Randolph in Mirsky's stead.

On July 15, 1997, Randolph moved to dismiss the charges against the petitioner, arguing that the court had violated the petitioner's right to the effective assistance of counsel by failing to canvass him concerning a waiver of his right to conflict free representation at the July 2, 1996 probable cause hearing. The court,

---

[20] According to the information provided to the habeas court and uncontested by either party, Mirsky is deceased.

*Ford, J.*, heard argument on the motion to dismiss on October 9, 1997. During that hearing, Satti (the prosecuting attorney) stated: "The claim of the [petitioner] is that the court had an obligation to inquire, on the record, regarding a conflict. Our position is that that was made known to the court, in chambers, and the response of the defense counsel, on the record, foreclosed any further inquiry by the court, therefore, not necessitating an inquiry on the record because it was done in chambers." This statement forms the basis of the petitioner's allegation that he was excluded from an in-chambers conference concerning a possible conflict of interest.

During the habeas trial, the petitioner's counsel questioned Satti repeatedly about his October 9, 1997 statement and whether an in-chambers conference regarding a potential conflict had occurred. On direct examination, in response to counsel's question: "Did you have an in-chambers conversation . . . about the conflict that existed between [Mirsky] representing [the petitioner] and St. Julien at the same time?" Satti stated: "I have no memory of that." Satti then reviewed the transcript of October 9, 1997, but did not further testify during his direct examination as to this alleged in-chambers conference. The petitioner's counsel renewed her inquiry on redirect examination, leading to the following colloquy:

"[The Petitioner's Counsel]: Do you recall the in-chambers or judicial pretrial, however you want to call it, conversation that you had with [Mirsky] concerning [the petitioner] and [St. Julien]?

"[The Witness]: For both of them?

"[The Petitioner's Counsel]: Yes.

"[The Witness]: No. That—I have no—*that did not occur.*

"[The Petitioner's Counsel]: If there's a transcript that says where you say, on the record, that you had an in-chambers discussion about the conflict, would that refresh your recollection?

"[The Witness]: Is that the item you gave me earlier today?

"[The Petitioner's Counsel]: It might have been. I believe there were two separate days, but it might have been. . . .

"[The Witness]: And *I do recall saying that there was an in-chamber*[s]—*not that I participated in the in-chambers conference, but there was an in-chambers conference* between [Mirsky], and I forgot who the—Judge Maiocco, I believe it was, did the [probable cause hearing]. So, that was—where I saw on that document, I was referring to the fact that there was a motion to dismiss filed by [Randolph] . . . .

"[The Petitioner's Counsel]: . . . Do you recall what dates the supervised judicial pretrials occurred?

"[The Witness]: In the beginning of October.

"[The Petitioner's Counsel]: Was that the only one?

"[The Witness]: That was the only one that I noted in my file, *which leads me to believe that there* [*were*] *no other ones.*

"[The Petitioner's Counsel]: Do you have in your file any other notes concerning when judicial pretrials occurred?

"[The Witness]: In my notes, yes. And there were no other notes of any judicial pretrials with the other defendants, *not* [*the petitioner*], *clearly.* . . .

"[The Petitioner's Counsel]: Okay. Now, on [May 28], 1997, and I might have showed you this transcript, I don't recall . . . the court says to [the petitioner],

you're aware that [Mirsky] has to withdraw because he represents one of the codefendants, and it would be a conflict of interest. And at the prior hearing in probable cause, which occurred in July of 1996, Mirsky said that he did not believe that there was a conflict of interest.

"Now, the judicial pretrials that we've talked about, did one of those—or do you have any idea if a judicial pretrial or an in-chambers conversation happened around May of [1997]?

"[The Witness]: *I don't have any independent recollection of that.*

"[The Petitioner's Counsel]: Would you have any notes concerning that in your file?

"[The Witness]: *If they existed, I would. And there's none in the file. . . .*

[Satti briefly left the witness stand to procure his file from the petitioner's criminal prosecution.]

"[The Petitioner's Counsel]: . . . Can you look into your file and see if there were any notes concerning judicial pretrial or in-chamber[s] discussions in [the petitioner's] or St. Julien's case with [Mirsky] around—

"[The Witness]: Well, I didn't bring St. Julien's file with me. You asked me only to bring [the petitioner's], but I'll look in the [petitioner's] file. . . . So, I reviewed my notes, which are—*I write down everything I do.* First note is appointment of counsel and setting of a hearing in probable cause date, the probable cause date. *There is no other note regarding* [*Mirsky*]. The first note is conversations with [Randolph], and the presiding judge at that time was Judge John Ronan. . . .

"The Court: So, I mean, for the court's information, counsel, I get, at some point, lots of files get to the point where there's supervised judicial pretrial. This case is pending for a year, and you don't have any notes

about any general conversations you have with defense counsel about what's going on with the file, where it's moving? I mean, what goes on? I mean, I know for a fact files don't just meander along for a year without some discussions.

"[The Witness]: Correct. And on this file, it was unique in that it appeared that nobody wanted to resolve anything, and you're right, I didn't write that specific note down. But I have a memory of nobody wanted to resolve it. And it basically went from a point where there was inaction on the file for whatever the reason was, and then the only other action was [Randolph] getting in the file, which would have been [1997], which we then had the trial." (Emphasis added.)

In its memorandum of decision, the habeas court found that the in-chambers conference that the petitioner alleged had taken place never actually occurred. The court did not mention Satti's comments during the October 9, 1997 hearing,[21] it concluded that neither the transcript of the July 2, 1996 probable cause hearing nor

[21] Although "the trier [of fact] is bound to consider all the evidence which has been admitted, as far as admissible, for all the purposes for which it was offered and claimed . . . [w]e cannot assume that the court's conclusions were reached without due weight having been given to the evidence presented and the facts found." (Citations omitted; internal quotation marks omitted.) *Giamattei* v. *DiCerbo*, 135 Conn. 159, 162, 62 A.2d 519 (1948). Unless "[a] statement [by the court] . . . suggest[s] that the court did not consider [certain] testimony, we . . . are entitled to presume that the trial court acted properly and considered all the evidence." (Internal quotation marks omitted.) *Moye* v. *Commissioner of Correction*, 168 Conn. App. 207, 229–30, 145 A.3d 362 (2016), cert. denied, 324 Conn. 905, 153 A.3d 653 (2017). We will thus not presume, from the habeas court's failure to mention Satti's comments during the October 9, 1997 hearing in its memorandum of decision, that it disregarded those comments in the course of ruling on the petitioner's claim. Given the centrality of those comments to the petitioner's case, however, we reiterate that "[a] court should strive to avoid leaving litigants with the impression that it has failed to discharge its duty or somehow acted unlawfully . . . [and should not] abrogate [its] duty to review the evidence admitted at trial or . . . give litigants the erroneous impression that [it has] done so." Id., 235.

the transcript of Mirsky's withdrawal and Randolph's appointment on May 28, 1997, supported the petitioner's allegations. It further determined that Satti had, during his habeas trial testimony, "offered no information that would support the petitioner's claim."

"It is well established that the burden of establishing grounds for relief in a habeas corpus proceeding rest[s] with the petitioner. . . . The petitioner, as the plaintiff in a habeas corpus proceeding, bears a heavy burden of proof." (Citation omitted; internal quotation marks omitted.) *Morales* v. *Commissioner of Correction*, 99 Conn. App. 506, 510, 914 A.2d 602, cert. denied, 282 Conn. 906, 920 A.2d 308 (2007). "As a general matter, the underlying historical facts found by the habeas court may not be disturbed unless they were clearly erroneous . . . ." (Internal quotation marks omitted.) *Donald G.* v. *Commissioner of Correction*, 224 Conn. App. 93, 112, 311 A.3d 187, cert. denied, 349 Conn. 902, 312 A.3d 585 (2024). "[A] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Valentine* v. *Commissioner of Correction*, 219 Conn. App. 276, 288, 295 A.3d 973, cert. denied, 348 Conn. 913, 303 A.3d 602 (2023). "Our function is not to examine the record to see if the trier of fact could have reached a contrary conclusion." *Siano* v. *Warden*, 31 Conn. App. 94, 95, 623 A.2d 1035, cert. denied, 226 Conn. 910, 628 A.2d 984 (1993).

We discern no clear error in the habeas court's finding that no in-chambers discussion occurred. Indeed, at several points Satti's testimony during the habeas trial undercuts such a conclusion. In particular, Satti explained that, although he "write[s] down everything [he] do[es]," his file from the petitioner's case contained

no notes regarding Mirsky following his appointment as trial counsel, nor did it indicate that Satti participated in any in-chambers conversations concerning the petitioner in or about May, 1997, when Mirsky moved to withdraw from representation. Furthermore, Satti testified that, although he recalled making his comments on October 9, 1997, he did not recall any in-chambers conference having taken place; indeed, at one point he stated that such a conference "did not occur." When this testimony is considered alongside the transcript of October 9, 1997, the record is, at best, ambiguous as to whether the discussion from which the petitioner alleges he was excluded actually happened. Because the petitioner had the burden of proof, the habeas court was free, in light of the conflicting evidence in the record, to conclude that the petitioner had not established the factual predicate of his claim. Mindful of the limited scope of our review of the habeas court's factual findings, we are not—on this record—left with a "definite and firm conviction" that the habeas court erred in finding that no in-chambers discussion occurred. Accordingly, the petitioner's claim fails, and we therefore do not reach the question of whether the petitioner's alleged exclusion from such a discussion violated his constitutional rights.

### III

The petitioner next claims that the habeas court erred when it concluded that his first habeas counsel, McKay, did not render ineffective assistance by failing (1) to raise a *Brady* claim pertaining to an undisclosed statement given by the petitioner's codefendant, St. Julien, to the Bridgeport Police Department, and (2) to raise the claim that the petitioner had been excluded from a critical stage of his underlying criminal proceeding, which we have discussed in part II of this opinion. We disagree.

The following additional facts and procedural history are relevant to this claim. In his underlying criminal proceeding, the petitioner was charged with, inter alia, kidnapping in the second degree in violation of § 53a-94 (a), conspiracy to commit kidnapping in the second degree in violation of §§ 53a-48 and 53a-94 (a), and felony murder in violation of § 53a-54c. At the time of the petitioner's trial in 1997, as is the case today, § 53a-94 (a) provided: "A person is guilty of kidnapping in the second degree when he abducts another person." At the petitioner's trial, the court instructed the jury that it could not find the petitioner guilty of kidnapping unless it "first [found] it established that there was . . . a restriction of [the victim's] movement, that it [had] been done intentionally . . . and it [had] the effect of interfering substantially with the victim's liberty." Kidnapping in the second degree was also the predicate felony for the felony murder charge. The state argued at trial that the victim had been kidnapped because he had been dragged off the porch of 244 Olive Street in Bridgeport and forced into a car that the petitioner was driving.

The petitioner was found guilty by the jury on October 21, 1997. The following day, St. Julien entered an *Alford* plea to conspiracy to commit kidnapping in the second degree. That same day—October 22, 1997—St. Julien also gave a recorded statement, in the presence of his counsel, to Detective Robert Martin of the Bridgeport Police Department in the office of the state's attorney in Bridgeport. A transcript of this statement was entered into evidence in the habeas trial.

In his statement, St. Julien stated in relevant part that, on May 11, 1996—the day of the incident at issue—he and the petitioner had traveled to 244 Olive Street to ask Hamilton, who resided at that address, for some money that he owed St. Julien. When St. Julien and the petitioner arrived at Hamilton's residence, the victim

was already there. After St. Julien and the petitioner arrived, St. Victor also arrived at the residence separately and also asked Hamilton for money that he owed him.[22] An argument ensued between St. Victor and Hamilton. While the argument between St. Victor and Hamilton was ongoing, the petitioner told St. Julien, "let's go," and the petitioner and St. Julien went to sit in the petitioner's car. The petitioner sat in the driver's seat and St. Julien sat in the front passenger seat. The petitioner started the car and began trying to fix its tape player. As he was doing so, St. Julien saw St. Victor and the victim walking toward the car. St. Victor and the victim got into the car and asked, "what was doing?" St. Julien stated that, at that time, he, the petitioner, St. Victor and the victim were "just chilling . . . ." When Martin asked St. Julien if the victim had "indicate[d] to you or anybody else that you heard that he didn't want to go in the car," St. Julien responded: "No. I just [saw] him and [St. Victor] coming [toward] the car." St. Julien likewise denied hearing "any discussion of, asking or telling [the victim] to come along" with him, the petitioner, and St. Victor.

St. Julien further stated that, after St. Victor and the victim got into the car, the four of them drove to Johnson's residence to pick him up and "[go] chilling" with him before St. Julien and the petitioner went to a movie. They picked up Johnson, who got into the backseat next to the victim. Johnson and the victim then got into an argument in which Johnson stated: "I need to know where my shit at . . . ." St. Julien did not know to what Johnson was referring. Johnson and the victim began hitting each other in the backseat, at which point the petitioner, who was driving, stated: "[Y]o, chill, you can't be doing that shit, you have to stop." Johnson

---

[22] In his statement, St. Julien referred to St. Victor and Hamilton as "Sammy" and "Bushwick," respectively. St. Victor was routinely referred to as "Sammy" throughout the petitioner's criminal proceedings.

then told the petitioner to drive him to an area near Bishop Avenue in Bridgeport. Johnson did not say why he wanted to go to that location, but St. Julien assumed that it was because Johnson "[sold] drugs in that side of town . . . ." Once they arrived, Johnson and the victim got out of the car, at which point they began arguing again. As the argument escalated, Johnson pulled out a gun. The petitioner got out of the car and said: "[W]hat [are] you doin[g] . . . chill, don't do that." Johnson then shot the victim twice.

St. Julien did not testify in the petitioner's criminal trial, nor did he testify in the habeas trial in this matter. At the habeas trial, Satti testified that, although St. Julien gave his statement to Martin in the state's attorney's office, he (Satti) was not present. The transcript of St. Julien's statement does not indicate that anyone was present apart from St. Julien, Mirsky (his attorney), and Martin. Satti further testified that the police would "routinely" use a room at the state's attorney's office to conduct interviews and that, in St. Julien's case, because he was incarcerated, the police decided to take his statement at the state's attorney's office because "they couldn't take it at the police station . . . ." Though he did not recall the precise procedure by which the police could arrange to use the room for an interview, Satti confirmed that the police would have had to arrange the interview with someone in the state's attorney's office ahead of time. Satti had no recollection of having been personally notified in advance that St. Julien intended to give a statement. He also testified that, prior to giving the statement to Martin, St. Julien had exercised his right to remain silent and that he (Satti) had had no discussions with either St. Julien or his counsel regarding a waiver of that right before St. Julien gave the statement. Satti admitted that, when he received a copy of St. Julien's statement, he did not provide it to the petitioner's counsel.

McKay, the petitioner's first habeas counsel, testified briefly in the habeas trial in the present case. He testified that he did not recall the claims he had raised in the first habeas petition; that he did not recall the names of the petitioner's codefendants; that he had a "vague recollection" of a statement from one of the petitioner's codefendants[23] but did not recall what it said; and that he had not been able to review any materials in preparation for his testimony, in part because he had previously turned over his file to another attorney after his representation of the petitioner concluded. After reviewing a portion of the transcript from the first habeas trial, McKay testified that his recollection had not been refreshed.

In her closing argument before the habeas court in the present case, the petitioner's counsel argued that St. Julien's statement was material and exculpatory within the meaning of *Brady* because it undercut the state's claim that the victim had been kidnapped and demonstrated that he had in fact gotten into the petitioner's car "o[f] [his] own accord." She also argued that McKay as well as the petitioner's second and third habeas counsel had rendered ineffective assistance by failing to conduct an adequate investigation into the statement's existence and to plead a *Brady* claim based on the statement's suppression.

The habeas court ruled against the petitioner on his claims of ineffective assistance of first habeas counsel. Relevant to this appeal, the court concluded that the petitioner could not establish deficient performance

---

[23] The record reflects that St. Victor also gave a statement to Martin. St. Victor gave his statement one day after the incident at issue, on May 12, 1996, and it is part of the petitioner's criminal file. The petitioner did not allege that McKay or any of the petitioner's prior habeas counsel had actual knowledge of St. Julien's October 22, 1997 statement; the petitioner represented to the habeas court that St. Julien's statement was not discovered until 2022.

because McKay had testified that he had no memory of the petitioner's case, meaning that the petitioner was unable to present "affirmative evidence sufficient to overcome the presumption of competent representation." The court further determined that, even if the petitioner could establish deficient performance, he could not establish prejudice from McKay's failure to plead and prove a *Brady* claim pertaining to St. Julien's statement because St. Julien's statement was not " 'material' " under *Brady*. In particular, the court concluded that St. Julien's statement was "fact-starved" and implausible, such that there was no reasonable probability that it would have changed the outcome of the petitioner's trial. The court also wrote, in a footnote, that, "[g]iven the determination by the court already in analyzing other claims that there is no credible proof that there was an in-chambers conversation about the petitioner's defense counsel having a conflict of interest . . . there is no need for the court to analyze those claims in the context of the petitioner's claim that . . . McKay was ineffective for failing to prove these claims against . . . Randolph."

"We begin with well settled legal principles, including our standard of review. To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Because both prongs . . .

must be established for a habeas petitioner to prevail, a court may [deny] a petitioner's claim if he fails to meet either prong. . . .

"Our Supreme Court, in *Lozada* v. *Warden*, [supra, 223 Conn. 843], established that habeas corpus is an appropriate remedy for the ineffective assistance of appointed habeas counsel, authorizing . . . a second petition for a writ of habeas corpus . . . challenging the performance of counsel in litigating an initial petition for a writ of habeas corpus . . . [that] had claimed ineffective assistance of counsel at the petitioner's underlying criminal trial or on direct appeal. . . . Our Supreme Court subsequently expanded *Lozada*'s holding to encompass third habeas petitions challenging the performance of second habeas counsel. . . . Nevertheless, the court in *Lozada* also emphasized that a petitioner asserting a habeas on a habeas faces the herculean task . . . of proving in accordance with [*Strickland*] both (1) that his appointed habeas counsel was ineffective, and (2) that his trial counsel was ineffective. . . .

"Simply put, a petitioner cannot succeed . . . on a claim that his habeas counsel was ineffective by failing to raise a claim against trial counsel or prior habeas counsel in a prior habeas action unless the petitioner ultimately will be able to demonstrate that the claim against trial or prior habeas counsel would have had a reasonable probability of success if raised. . . .

"The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed [on appeal] unless they are clearly erroneous. . . . Thus, the [habeas] court's factual findings are entitled to great weight. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review. . . .

Whether a petitioner received constitutionally inadequate representation is a mixed question of law and fact that requires plenary review." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Crocker* v. *Commissioner of Correction*, 220 Conn. App. 567, 583–86, 300 A.3d 607, cert. denied, 348 Conn. 911, 303 A.3d 10 (2023).

### A

The petitioner argues that the habeas court improperly determined that McKay was not ineffective for failing to raise a *Brady* claim pertaining to St. Julien's statement. Because we agree with the habeas court's conclusion that St. Julien's statement was not material within the meaning of *Brady*, and hence that the petitioner was not prejudiced,[24] we reject the petitioner's claim.

---

[24] Although we decide the petitioner's claim under *Strickland*'s prejudice prong, we note that the habeas court's reasoning in concluding that the petitioner had failed to establish deficient performance runs contrary to precedent from our Supreme Court. The habeas court gave great weight to the fact that McKay was unable to recall any details of the petitioner's case and concluded that the petitioner had accordingly failed to present sufficient evidence of deficient performance. In particular, the habeas court stated: "[B]eing unable to elicit direct evidence on the information counsel possessed *at the time* of the representation and why he made certain decisions *at that time* raises a hurdle making it impossible for the petitioner to establish the deficient performance prong of the *Strickland* test." (Citations omitted; emphasis in original.) The court further stated that "McKay's lack of memory cannot be claimed as the equivalent of presenting affirmative evidence sufficient to overcome the presumption of competent representation." However, in *Jordan* v. *Commissioner of Correction*, 341 Conn. 279, 267 A.3d 120 (2021), which was decided prior to the petitioner's habeas trial in the present case, our Supreme Court expressly disapproved of such reasoning, holding that, when trial counsel is unavailable to testify at a habeas trial, "requiring [a] habeas petitioner . . . to [nonetheless] provide evidence of counsel's subjective state of mind would undoubtedly and impermissibly heighten the petitioner's burden under *Strickland*." (Emphasis omitted.) Id., 291. Our Supreme Court further held that, "[i]n that circumstance, as always, the court must contemplate the possible strategic reasons that might have supported the challenged action and then consider whether those reasons were *objectively* reasonable." (Emphasis added.) Id., 290. As the court in *Jordan* has made clear, it was improper for the habeas court

"In *Brady* . . . the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]. . . . [E]vidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (Citations omitted; internal quotation marks omitted.) *Morant* v. *Commissioner of Correction,* 117 Conn. App. 279, 284–85, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009). A trial court's determination as to materiality under *Brady* presents a mixed question of law and fact subject to plenary review, with the underlying historical facts subject to review for clear error. See, e.g., *State* v. *Ortiz,* 280 Conn. 686, 720, 911 A.2d 1055 (2006).

As a threshold matter, it is unclear whether a *Brady* claim pertaining to St. Julien's statement is cognizable, given that his statement did not come into existence until one day after the petitioner's trial had concluded. In *District Attorney's Office* v. *Osborne,* 557 U.S. 52, 68–69, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009), the United States Supreme Court held that *Brady*'s disclosure obligation does not continue "after [a] defendant [is] convicted and the case [is] closed," explaining that *Brady* is a "preconviction trial [right]" that a defendant

to rely on McKay's unavailability—that is, on his lack of memory; see *State* v. *Schiappa,* 248 Conn. 132, 140–41, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999)—in concluding that the petitioner had failed to establish deficient performance, without considering whether there were any objectively reasonable strategic reasons for counsel's actions or inactions.

does not retain once he has been "proved guilty after a fair trial" and lost the presumption of innocence.

Some courts have held that, notwithstanding *Osborne*, a prosecutor's *Brady* obligations continue through to the conclusion of a defendant's direct appeal—a rule that would mean St. Julien's statement *was* subject to *Brady* disclosure because our Supreme Court did not decide the petitioner's direct appeal until 2001. See, e.g., *Fields* v. *Wharrie*, 672 F.3d 505, 514–15 (7th Cir. 2012); *Runningeagle* v. *Ryan*, 686 F.3d 758, 772 n.6 (9th Cir. 2012), cert. denied, 569 U.S. 1026, 133 S. Ct. 2766, 186 L. Ed. 2d 233 (2013). The United States Court of Appeals for the Second Circuit, by contrast, appears to have concluded that the prosecutor's *Brady* obligations terminate at the moment of conviction; see, e.g., *United States* v. *Santos*, 486 Fed. Appx. 133, 135 n.1 (2d Cir. 2012) (summary order); and at least one District Court within the Second Circuit has accordingly determined that, under *Osborne*, a prosecutor had no duty to disclose allegedly exculpatory statements by a codefendant that were made between a habeas petitioner's conviction and sentencing, like the statement at issue in this case. See *Dotsenko* v. *Joseph*, Docket No. 18-CV-1640 (WFK), 2019 WL 4917952, *4–5 (E.D.N.Y. October 4, 2019). Neither this court nor our Supreme Court appears to have addressed the implications of *Osborne*'s holding for *Brady* claims pertaining to evidence that comes into existence between the time of a petitioner's conviction but before sentencing and the conclusion of a direct appeal.

We need not decide this question today, however, because—even if we assume arguendo that the petitioner was entitled, under *Brady*, to material exculpatory information that only came into existence the day after his conviction—St. Julien's statement was not material. Although the petitioner argues that the statement "would have raised a reasonable doubt in the

minds of the jury as to the petitioner's guilt"; (internal quotation marks omitted); this argument, which focuses on the impact the statement would have had at the petitioner's criminal trial, defies logic. There is no reasonable probability that, had the statement been disclosed to the petitioner, the result of his trial would have been different because the earliest point at which the statement could conceivably have been disclosed—the day St. Julien gave it—was after the trial had concluded.

Nonetheless, had St. Julien's statement been promptly disclosed, the petitioner could have filed a motion for a new trial on the basis of newly discovered evidence pursuant to General Statutes § 52-270.[25] See *Reyes* v. *State*, 222 Conn. App. 510, 529, 306 A.3d 5 (2023), cert. denied, 348 Conn. 944, 307 A.3d 910 (2024). As such, for purposes of the materiality analysis, we consider whether there was a reasonable probability that St. Julien's statement, had it been presented in support of such a motion, would have resulted in a new trial for the petitioner.[26]

---

[25] General Statutes § 52-270 (a) provides in relevant part: "The Superior Court may grant a new trial of any action that may come before it, for . . . the discovery of new evidence . . . or for other reasonable cause, according to the usual rules in such cases. . . ."

Section 52-270 is not the only mechanism by which a defendant may move for a new trial. Under Practice Book § 42-53, formerly § 902, a defendant may also move for a new trial "if it is required in the interests of justice." However, the disclosure of St. Julien's statement would not have provided the petitioner a ground on which to seek a new trial under this latter provision because a motion under Practice Book § 42-53 may not be based on newly discovered evidence. See *State* v. *Legrande*, 60 Conn. App. 408, 419, 759 A.2d 1027 (2000), cert. denied, 255 Conn. 925, 767 A.2d 99 (2001).

[26] Because the petitioner does not argue on appeal that he could have used St. Julien's statement to secure a more favorable sentence, we do not consider the impact, if any, that St. Julien's statement might have had on the petitioner's punishment. Although the petitioner does not *explicitly* argue on appeal that he could have used St. Julien's statement as the predicate for a new trial motion, we think it is nonetheless appropriate to consider the statement's materiality for that purpose because the petitioner's brief focuses on the statement's materiality as to his guilt of the crimes charged.

For a petitioner to be entitled to a new trial on the basis of newly discovered evidence, he must establish (1) that the proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence; (2) that it would be material in a new trial; (3) it is not merely cumulative; and (4) it is likely produce a new result in a different trial. See, e.g., *Asherman* v. *State*, 202 Conn. 429, 434, 521 A.2d 578 (1987). In *Shabazz* v. *State*, 259 Conn. 811, 827, 792 A.2d 797 (2002), our Supreme Court held that a trial court considering whether newly discovered evidence satisfies *Asherman*'s fourth prong must evaluate whether that evidence "passes a minimum credibility threshold." As the court made clear in *Shabazz*, this holding broke no new ground; rather, it was simply a crystallization of prior Connecticut case law, dating to the nineteenth century, on the granting of new trials. See id., 822–23 (collecting cases). In *Adams* v. *State*, 259 Conn. 831, 841, 792 A.2d 809 (2002), decided on the same day as *Shabazz*, the court further explained that, "absent extraordinary or extenuating circumstances, the court [considering a motion for a new trial] should make its credibility assessments . . . on the basis of the presentation of live testimony, rather than on the basis of a printed record." This holding, too, is consistent with long established principles for determining the credibility of evidence. See, e.g., *State* v. *Synakorn*, 239 Conn. 427, 436, 685 A.2d 1123 (1996) (trier of fact's "firsthand observation of [witnesses'] conduct, demeanor and attitude" renders it better judge of witness credibility than reviewing court, which is limited to "cold printed

---

Because a motion for a new trial based on newly discovered evidence also evaluates whether that evidence might have resulted in a not guilty verdict (albeit using a slightly less lenient standard of probability than that used for *Brady* claims), the petitioner's arguments as to materiality are adequate for us to evaluate whether St. Julien's statement would have resulted in a new trial. See *Jones* v. *State*, 328 Conn. 84, 102–103, 177 A.3d 534 (2018) (comparing standard for materiality under *Brady* with standard for ruling on motion for new trial).

record" (internal quotation marks omitted)); *State* v. *Henning*, 220 Conn. 417, 420, 599 A.2d 1065 (1991) (same); *Wieler* v. *Commissioner of Correction*, 47 Conn. App. 59, 61, 702 A.2d 1195 (same), cert. denied, 243 Conn. 957, 704 A.2d 806 (1997).

In light of the bedrock legal principles articulated in *Shabazz* and *Adams*, we do not believe that there is a reasonable probability that St. Julien's statement would have satisfied *Asherman*'s fourth prong, thereby entitling the petitioner to a new trial. St. Julien's statement is a written document—precisely the kind of "printed record" that our courts have long held to be an insufficient basis on which to make a credibility determination. It is, of course, theoretically *possible* that St. Julien may have supplemented his statement with live testimony had the petitioner filed and litigated a motion for a new trial, but St. Julien did not testify during the habeas trial and the habeas court made no findings as to whether St. Julien would have testified had the petitioner moved for a new trial, or whether his testimony would have been credible and consistent with his statement, and we may not and will not speculate on the subject. See, e.g., *Priest* v. *Edmonds*, 295 Conn. 132, 138, 989 A.2d 588 (2010) (role of reviewing court "is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court" (internal quotation marks omitted)). Presented with St. Julien's written statement, standing alone, we do not think that there is a reasonable probability that a court would have found that evidence sufficiently credible to grant the petitioner a new trial.[27]

We thus conclude that, even if the prosecutor had an obligation under *Brady* to disclose material exculpatory

---

[27] Indeed, although the habeas court at times purported to evaluate the statement's credibility without the benefit of live testimony from St. Julien, it also wrote that "it is not possible to assess the substance and impact of that statement without the ability to evaluate St. Julien's demeanor and credibility, and to see how he would hold up under cross-examination."

evidence that came into existence after the jury returned its verdict in the petitioner's criminal trial, the petitioner's claim predicated on St. Julien's statement would not have been viable because it was not material within the meaning of *Brady*. Therefore, McKay's failure to raise such a claim in the petitioner's first habeas case did not prejudice the petitioner.

B

The petitioner also claims that the habeas court improperly concluded that McKay did not render ineffective assistance by failing to plead and prove that the petitioner was excluded from a critical stage of his criminal prosecution—namely, the alleged in-chambers conference pertaining to Mirsky's conflict of interest. We disagree.

In light of our analysis in part II of this opinion, this claim merits only a brief discussion. When reviewing a claim of ineffective assistance of counsel, we are bound by the habeas court's factual findings unless they are clearly erroneous. See, e.g., *Crocker* v. *Commissioner of Correction*, supra, 220 Conn. App. 586. As we have discussed, the habeas court found that no in-chambers conference regarding a conflict of interest had occurred, and that factual finding is not clearly erroneous. Therefore, the petitioner cannot have been prejudiced by McKay's failure to plead and prove a claim predicated on the petitioner's exclusion from that alleged conference.

IV

The petitioner also claims that the habeas court erred when it concluded that his second habeas counsel, Mullaney, and his third habeas counsel, Goddard and Waldron, had not rendered ineffective assistance[28] by failing

---

[28] When our Supreme Court decided *Kaddah* v. *Commissioner of Correction*, 324 Conn. 548, 570–71, 153 A.3d 1233 (2017), holding that a petitioner may bring a habeas petition predicated on ineffective assistance of *second* habeas counsel, it expressed no view as to the availability of a claim of

to plead and prove the ineffectiveness claims discussed in part III of this opinion against McKay. We disagree.

The habeas court concluded in relevant part that, because the petitioner had failed to prove his ineffectiveness claims against McKay, he could not establish that Mullaney, Goddard, or Waldron were ineffective for failing to raise those claims against McKay in the petitioner's second and third habeas petitions. For the reasons we set forth in part III of this opinion, we agree that the petitioner's ineffectiveness claims against McKay lack merit. Therefore, there is no reasonable probability that, had the petitioner's second or third habeas counsel raised those claims, the petitioner would have prevailed in those prior habeas proceedings.

The judgment is affirmed.

In this opinion the other judges concurred.

———————————————

ineffective assistance against third habeas counsel and beyond. See id., 570 n.19. Nevertheless, since *Kaddah*, this court has on at least one occasion ruled on the merits of a claim of ineffective assistance of a petitioner's third habeas counsel; see *Tatum* v. *Commissioner of Correction*, supra, 211 Conn. App. 75–76; and for the purposes of this appeal, we assume without deciding that the petitioner's claim of ineffective assistance against Goddard and Waldron is one for which habeas corpus relief is available.